APPEL, Justice
(dissenting).
I respectfully dissent.
I concur with Justice Wiggins’s opinion. In light of the virtually unprecedented determination of Justice Mansfield’s opinion to reach out to uphold the district court on grounds other than those decided by the district court and that the parties chose not to present on appeal, I proceed to state *50 my views on why these alternative grounds do not provide a basis for dismissal in this case at the very inception of the lawsuit.
In my view, education is a fundamental interest or right under the Iowa Constitution. Deprivations of a basic or adequate education should be subject to heightened judicial review, and other material differences in education should be subject to judicial review under a meaningful rational basis test. I further believe the pleading, though not very clear, is sufficient to survive a motion to dismiss at this stage of the proceedings under our well-established liberal pleading rules. I would therefore reverse the district court and remand the case for further proceedings.
I. Overview of Plaintiffs’ Petition.
The plaintiffs in this case are from both rural and urban school districts alleging shortcomings in the education provided by the State. They allege, among other things, that the State has failed to provide them with “equal access to an effective education” and that the State has failed “to establish and maintain an adequate education delivery system.”
The plaintiffs’ petition in this case alleges the State’s educational requirements and accreditation standards do not ensure that students “will be able to meet and exceed the technological, informational and communication demands of society so that they can be prepared for responsible citizenship, further learning and productive employment in a global economy.” They claim that many Iowa students “are not prepared to enter the workforce or post-secondary education without additional training or remediation.”
The plaintiffs support their adequacy claim with various statistics. They allege, for instance, that under the National Assessment of Academic Progress standards, only thirty-three percent of Iowa fourth grade students are proficient in math, and only thirty-seven percent of students are proficient in reading. It is alleged that similar proficiency levels are achieved for eighth graders.
The plaintiffs also allege that the smallest school districts in Iowa are disadvantaged in that they have teachers with less experience and that the teachers have nearly double the teaching assignments compared with teachers in larger school districts. They also claim rural students have far fewer curriculum units available to students. They allege that there is a disparity in educational outcomes based upon where one lives.
The plaintiffs assert that the lack of adequate education violates the education provisions of article IX of the Iowa Constitution; the privileges and immunities clause of the Iowa Constitution; the due process clause of the Iowa Constitution; and statutory standards established in Iowa Code section 256.37, which declares that it is the policy of the state “to provide an education system that prepares the children of this state to meet and exceed the technological, informational, and communications demands of our society.” The plaintiffs seek declaratory relief as well as a writ of mandamus, and the district court was urged to retain continuing jurisdiction for the purpose of enforcing its orders and judgments.
II. Historical Roles of National and State Government in Educating Children.
A. Introduction. In order to provide the necessary context for consideration of the constitutional issues raised in Justice Mansfield’s opinion (but not in the appellate briefs), I review the contrasting roles of the state and national governments in the provision of education to children. As will be seen below, although the national government traditionally has supported *51 education of children through land grants and financial assistance, the responsibility for providing education to children has been the duty of state and local governments. '
B. The Limited Role of the National Government in the Education of Children. The education of children had little to do with the American Revolution. The grievances against King George III in the Declaration of Independence had nothing to do with the education of children. The education of children was not mentioned in the Articles of Confederation or in the United States Constitution. The only mention of education in the debates at the constitutional convention was a suggestion by Madison and Pickney that Congress be expressly authorized to establish a university, a proposal that was rejected. James Madison, Notes of Debates in the Federal Convention of 1787, at 477-78, 689 (Bicentennial ed., W.W. Norton & Co., Inc.1987); see Lawrence A. Cremin, American Education: The National Experience 1783-1876, at 127 (1980) [hereinafter Cremin].
The lack of discussion of education of children in revolutionary and constitutional contexts does not mean that the founders were unconcerned about education. The contrary is true. From the very beginning, the founders were advocates of expanding children’s education.
For example, Thomas Jefferson, while serving in the Virginia legislature, was a fierce advocate of a Bill for the More General Diffusion of Knowledge, which would have established a system of free schools supported by tuition and scholarships for poor boys. Ian C. Friedman, Education Reform 8 (2004). In a letter to George Washington, Jefferson explained it was axiomatic that liberty could never be safe but “in the hands of the people themselves, and that too of the people with a certain degree of instruction.” Gordon C. Lee, Learning and Liberty: The Jeffersonian Tradition in Education, in Crusade Against Ignorance: Thomas Jefferson on Education 19 (1961). “This,” Jefferson wrote, “is the business of the state to effect, and on a general plan.” Id.
John Adams was the principal author of the Massachusetts Constitution of 1780. As adopted, the Massachusetts Constitution of 1780 provided, “Wisdom and knowledge, as well as virtue, diffused generally among the body of the people, being necessary for the preservation of their rights and liberties,” the legislature has a duty to “cherish” the interests of science and literature. Mass. Const, of 1780, pt. II, ch. 5, § 2.
Benjamin Rush, a signer of the Declaration of Independence and member of the Continental Congress, addressed the Pennsylvania legislature with his essays, “A Plan for the Establishment of Public Schools and the Diffusion of Knowledge in Pennsylvania” and “Thoughts upon the Mode of Education Proper in a Republic.” Frederick M. Hess, The Same Thing Over and Over: How School Reformers Get Stuck in Yesterday’s Ideas 44 (2010). Rush called for a free school in every township and universal education at public expense, reasoning that all citizens, rich and poor, would have a role in selecting the nation’s leaders and that, as a result, everyone was entitled to-at least a minimal amount of education in reading, writing, and arithmetic. Id. at 44-45.
Jefferson, Adams, and Rush had at least three things in common. First, they were advocates .of education of children. Second, they saw education of children as linked to the successful operation of democratic government. But for my purposes, the most important point is that they viewed the states as the governmental structure to deliver education to citizens.
*52 During the formative years of our country, the federal government supported the education of children by providing resources to assist state and local governments in providing education to citizens. First, the federal government provided public land for school uses in the states through the Land Ordinance of 1785, which required land to be set aside for school uses. 28 Journals of the Continental Congress 378 (May 20, 1785). Second, in its organizations of the territories and admission of states, Congress demanded educational progress. In the Northwest Ordinance of 1787, Congress required public education to be “forever encouraged” in the covered territories. Northwest Ordinance, 32 Journals of the Continental Congress 340 (July 13, 1787). The federal government itself, however, had no direct role in the education of children, but simply provided important financial support through land grants to states and local governments who bore the responsibility of providing education.
The encouragement of public education took on added meaning when a territory applied to become a state. Under Article IV, Section 4 of the United States Constitution, Congress was empowered to admit states only if they had a “Republican Form of Government.” U.S. Const, art. IV, § 4. As states were admitted to the Union, it became “a working assumption that public education was an essential feature of a republican government based upon the will of the people.” David Tyack, Thomas James & Aaron Benavot, Law and the Shaping of Public Education, 1785-1954,, at 20 (1987).
Prominent antebellum education leaders such as Horace Mann of Massachusetts, Calvin Wiley of North Carolina, Caleb Mills of Indiana, Samuel Lewis of Ohio, John D. Pierce of Michigan, Robert Breck-inridge of Kentucky, Ninian Edwards of Illinois, Henry Barnard of Connecticut and Rhode Island, and John Swett of California all recognized the role of the states in providing education to children and youth. See David B. Tyack, Turning Points in American Educational History 125 (1967). These prominent advocates of universal education sought to advance their cause not through pontifications in the halls of Congress, but in the local lyceum and through mechanisms of state and local government.
C. The Duty of State Government to Provide Education to Children. In contrast to the limited role of the federal government, the states had direct responsibility of providing education. The difference in involvement between the federal government and the state governments on educational matters was a night and day contrast until very recently. Further, education traditionally has been one of the most important functions of state government. A brief survey of Iowa history demonstrates these points.
While revolutionary leaders tended to emphasize education of the elite, the movement for universal education through common schools emphasizing republican virtues began in the early nineteenth century and was in full bloom during the 1830s as the movement for expanded suffrage advanced. The focus of the common school movement was on state and local governments. See generally Frederick M. Binder, The Age of the Common School, 1830-1865 (1974); Cremin; Carl F. Kaestle, Pillars of the Republic: Common Schools and American Society, 1780-1860 (1983).
Even in the territorial days, the importance of education as a responsibility of territorial government was recognized in Iowa. Governor Henry Dodge of the Wisconsin Territory (which included Iowa at the time) recognized the relation between education and democratic government. In *53 his first inaugural address, Governor Dodge, in urging the territorial assembly to provide for the establishment of local academies for the education of youth, spoke in obligatory terms:
It is a duty we owe to the rising generation to endeavor to devise means to improve the condition of those that are to succeed us; the permanence of our institutions, must depend upon the intelligence of the great mass of the people.
1 Benjamin F. Shambaugh, The Messages and Proclamations of the Governors of Iowa 9 (1903) [hereinafter Shambaugh].
Once Iowa became a territory of its own apart from Wisconsin, Robert Lucas, the first Iowa territorial governor and a delegate of the 1844 constitutional convention, was a strong advocate of education. In his first message to the legislature of the Territory of Iowa, Lucas addressed education and particularly the need for a system of free common schools. John C. Parish, Iowa Biographical Series: Robert Lucas 286 (1907) [hereinafter Parish]. Lucas stated: “There is no subject to which I wish to call your attention more emphatically, than the subject of establishing, at the commencement of our political existence, a well digested system of common schools.” 1 Shambaugh at 78; John Purcell Street, Iowa Department of Public Instruction: Its Origins and Development, 80 Annals of Iowa 397, 398 (1950) [hereinafter Street]. Lucas called on the territorial assembly to “build up a good system as fast as the population and wealth of the territory would warrant.” 1 Clarence Ray Aurner, History of Education in Iowa 368 (1914) [hereinafter Aurner]. The first territorial assembly responded to his call by enacting legislation calling for the establishment of common schools in school districts in the respective counties. 1 Edgar R. Harlan, A Narrative History of the People of Iowa 133 (1931) [hereinafter Harlan].
Yet, territorial government did not provide the ideal framework for development of a system of local education. Advocates of statehood appealed to the parents of children, noting that lands reserved by the federal government for education purposes could not be obtained without statehood. James Alton James, Constitution and Admission of Iowa into the Union 15 (1900). Once Iowa was admitted to statehood, Iowa received a grant of five hundred thousand acres of land from the United States for school purposes. George Chandler, Iowa and the Nation 17 (Chicago, A. Flanagan 1895).
It is thus not surprising that education was emphasized in the first Iowa Constitutions. Article X of the constitutions of 1844 and 1846 dealt with education. The 1844 and 1846 constitutions provided that the general assembly “shall encourage, by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvement” through “a system of common schools.” Iowa Const, art. X, §§ 2-3 (1846); Iowa Const, art. X, §§ 2-3 (1844). According to a contemporaneous account of the 1846 constitutional convention:
Most ample provision is made for educating the rising generation. This is a feature which cannot be too highly prized. — It speaks volumes for the character of our population, and argues well for the prosperity of the people and the success of the great enterprise in which they are about to embark. Let the moral and mental culture [unintelligible in original] and the free institutions of our country will be safe in their hands.
Fragments of the Debates of the Iowa Constitutional Conventions of 18H and 1816, at 339 (Benjamin F. Shambaugh ed., 1900) (internal quotation marks omitted).
The inclusion of provisions in the early Iowa Constitutions related to education was not surplusage or cosmetic features. *54 One of the advantages of statehood was the establishment of machinery to develop a coherent educational system. Beginning with the admission of Ohio as a state in 1803, Congress required that all subsequent states provide for education in their state constitutions as a condition of admission to statehood. Gerald Unks, The Illusion of Intrusion: A Chronicle of Federal Aid to Public Education, 49 Educ. F. 133, 136 (1985). After 1815, only New Mexico attempted to gain admission into the Union without an education clause, and Congress refused to go along. New Mexico then added an education clause and was subsequently admitted into the Union. See Inst, for Educ. Equity & Opportunity, Education in the 50 States: A Deskbook of the History of State Constitutions and Laws about Education 29 (2008).
The very first act of the First General Assembly of Iowa was a measure related to school funds, demonstrating the importance of education to the fledgling state. 1 Aurner at 16-17. The importance of the educational function of government is reflected by the fact that the Chief Justice of the Iowa Supreme Court, Charles Mason, was a member of the first Iowa Board of Education. 2 Aurner at 415 n. 105.
The state’s first Superintendent of Education, Thomas Hart Benton, Jr., a nephew of the famous Senator from Missouri, was a national leader in the education movement, serving on the executive committee of the American Association for the Advancement of Education. Street, 30 Annals of Iowa at 400; Proceedings of the Fifth Session of the American Association for the Advancement of Education 3 (New York, Hartford Press 1856). Benton served as president of the Education Convention of Iowa, which met in 1848 in the old stone capítol at Iowa City, “to promote by every laudable means the diffusion of knowledge in regard to education and especially to aid in establishing and perpetuating a system of common school instruction.” Parish at 286-87. Benton later remarked in an 1861 report to the board of education that “[a] wagon can better dispense with one wheel than a neighborhood with the school house.” R.A. Harkness, Notes on Iowa Educational Work from 1860 to 1888, 12 Iowa Normal Monthly No. 7, at 298 (1889). One of Benton’s successors, Oran Fanville, remarked in 1865 that “universal education is the central idea of republicanism.” Id. at 299.
Iowa’s early state governors, like Robert Lucas, were advocates for education. In 1848, Governor Ansel Briggs recognized the constitutional significance of education, stating:
The people of Iowa have ever manifested an earnest and commendable zeal in the spread of education, and, especially, in the establishment of an efficient and permanent system of Common Schools. Of such prominent importance is this subject in their estimation, that they have made the most ample provisions in the Constitution for the spread of education and the support of common schools....
1 Shambaugh at 370.
In 1852, Governor Hempstead, who was also a delegate of the 1844 constitutional convention, addressed education in his first biennial message to the Iowa legislature. He noted that “no subject can claim a more pressing interest than that of public instruction.” Id. at 430. He further declared:
The first great object should be to place within the reach of every child in the state, the opportunity of acquiring those indispensable elements of education, which shall fit him for the enlightened discharge of civil and social duties to which he may be called.
Id. at 431. Governor Hempstead further emphasized the constitutional obligations *55 of the state, noting that the Iowa Constitution required that the general assembly encourage, by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvement. Id.
In 1856, Governor James Grimes emphasized education in his inaugural address. Governor Grimes stated that “[t]o accomplish these high aims of government, the first requisite is ample provision for the education of the youth of this State.” 2 Shambaugh at 7. He further declared that “[t]he State should see to it that the elements of education, like the elements of universal nature, are above, around, and beneath all.” Id. Governor Grimes noted that “[i]t is agreed that the safety and perpetuity of our republican institutions depends upon the diffusion of intelligence among the masses of the people.” Id.
In 1856, the general assembly authorized the governor to appoint a commission of three persons to revise and improve the school laws of Iowa and to report to the general assembly. Street, 30 Annals of Iowa at 402. The commission was headed by Horace Mann, the President of Antioch College in Ohio and one of the most noted educators in the United States. Id. Mann strongly believed in the “[ajbsolute right to an education of every human being that comes into the world, and which, of course, proves the correlative duty of every government to see that the means of that education are provided for all.” Serrano v. Priest, 5 Cal.3d 584, 96 Cal.Rptr. 601, 487 P.2d 1241, 1266 (1971) (citation and internal quotation marks omitted). The commission investigated the state of education in other states and ultimately issued a report containing its findings and recommendations. 1 Aurner at 31.
The report of the Mann Commission declared that every youth was entitled to an education “in the elements of knowledge.” Id. at 32. Further, anyone desirous of further progress should be offered necessary opportunities. Id. The report called for provision of common schools, high schools, and the university. Id. at 33. It called for supervision to be provided by a state superintendent of public instruction, subject to the advice of a state board of education. Id. at 35. Perhaps because of Mann’s association with the state, a commentator two decades later declared that “Iowa may be called the Massachusetts of the West.... [TJhe cause nearest the hearts of her people is ‘universal education.’ ” Editorial Preface, 12 Iowa Normal Monthly No. 7, at 1 (1889).
At the constitutional convention of 1857, considerable emphasis was placed on education. Discussing education, James Wilson declared:
We know that after all the intelligence of the people is the great bulwark to the stability and permanency of our institutions, and looking upon it in that light, it is our duty, our absolute and imperative duty, to provide the best method and the best means for carrying into effect the common school system of the state.
2 The Debates of the Constitutional Convention of the State of Iowa 750 (W. Blair Lord reporter, Davenport, Luse, Lane & Co. 1857) [hereinafter Debates], available at http://www.statelibraryofiowa.org/ services/eollections/law-library/iaconst/. Similarly, J.C. Hall asserted that “[t]he educational department of our State is a very important one. It embraces one-half of the inhabitants of the State, and for good or for evil it is productive of the most important effects upon our population.” Id. at 725. Further, George W. Ells urged:
[I]n laying the foundation for an educational system, we must discard all narrow views and prejudices, and not only provide for the wants of the present generation, but for all future generations. I desire to see the common *56 schools of this State so constituted that a thorough knowledge of all the natural sciences will be taught in the most practical manner. Should this point be attained they will contrast most favorably with the superficial education that characterizes a vast number of graduates of chartered colleges of these United States.
1 Debates at 602.
In light of the emphasis the Iowa framers placed on education, two divisions were adopted that dealt with the subject. The first division dealt primarily with the responsibilities of a state board of education, which was vested with authority to oversee the development of public education in the state. Iowa Const, art. IX, div. 1 (1857 original version). The second division related to financing of public education. Id. art. IX, div. 2. With respect to the constitutional provision that “the General Assembly shall encourage, by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvement,” id. art. IX, div. 2, § 3, one scholar has noted that “[a]s a positive provision no clause has had a wider application in popular benefits,” Harlan at 185. It is observed that “[a]n educational system, based upon common schools ... was one of the cornerstones of the new commonwealth” and that Iowa was taking a stand that at the time was distinctively “progressive.” Harlan at 185.
From 1857 to 1864, the state board of education performed its constitutional duties. In 1864, however, the newly elected governor, William Stone, recommended abolition of the state board of education. Governor Stone stated the purpose of creating the board of education was to establish a permanent and satisfactory system of public education in Iowa. 8 Shambaugh at 7. Governor Stone urged the discontinuation of the board because the purpose had been accomplished. Id. In 1864, the general assembly abolished the board of education and established a superintendent of public instruction. See 1864 Iowa Acts ch. 52, § 1.
Nothing in the historical record suggests that the abolition of the board of education reflected a lessened constitutional commitment to education. Experience under the 1857 constitution demonstrated that vesting legislative power over educational matters with the board, but the power of the purse with the general assembly, proved awkward at best. But the commitment to education remained. According to a leading Iowa historian:
There was a belief so widespread as to be almost universal that, narrow as were the powers of the State, instruction so differed from all things else that every child in the community was entitled to a chance at the public cost to obtain the essentials of the thing called education.
I George F. Parker, Iowa Pioneer Foundations 455 (1940).
Governors subsequently continued to be strong advocates for education after the state board was abolished. Governor Cyrus Clay Carpenter in his first inaugural address on January 11, 1872, stated in connection with education that “[n]ext to political freedom, the most important element of a good government is an intelligent people.” 4 Shambaugh at 8. While recognizing the progress that had been made, he called for the establishment of a Normal School, or teachers college, to train teachers for their important task. Id. at 8-9.
The relationship between education and freedom was repeated by Governor Burén Robinson Sherman in his January 12, 1882 inaugural address. Governor Sherman declared:
The education of the masses is the surest reliance of the State, and everywhere free schools exist. Through their *57 powerful enlightening influences and strong progression the integrity of our political fabric, the security to the enterprise of the citizen, and the equality and happiness of the people are solidly assured. Popular education has become firmly entrenched in the confidence of the nation, and there is no feature of our whole system so near to the general heart, nor regarded with such affectionate anxiety as the free public schools of the country.
5 Shambaugh at 241.
Further, Governor Sherman observed “our educational system” through all time “will prove the very sheet-anchor to our liberties, as the free-ballot is the cornerstone to our political structure.” Id. at 242.
Governor William Larrabee took up education in his first inaugural address on January 14, 1886. He declared, “If it is true, as I hold it to be, that ignorance, poverty and crime are intimately related, it is the duty of every state to educate.” 6 Shambaugh at 14. He noted that “[a] republic can survive war, famine and pestilence, but it cannot survive the intelligence of its people.” Id. at 15.
In the Progressive Era, many educational reformers emphasized the need to eliminate politics from education, develop a regime of experts, and offer highly differentiated education to youth based upon their ability and future role in society. It was an era of the “Education Commission.” Iowa had three of them. A school commission in 1907 recommended, among other things, approval of curriculum by the superintendent of public instruction. Street, 30 Annals of Iowa at 445. In 1911, the “Better Iowa Schools Commission” met and recommended increased power and efficiency in the department of public instruction, the employment of a “rural school inspector” under the department of public instruction, and that the office of superintendent of public instruction be converted into a nonpartisan electoral post. Id. at 446. In 1939, a school code commission reviewed the laws of Iowa and produced a report; a second school code commission was convened in 1941 and produced another report. Id. at 447-48. The latter code commissions called for strengthening the county administration of schools, that the cost of transporting pupils be paid in whole or in part by the state, that one quarter of the cost of public school education should be paid from state funds to relieve property taxes and “equalize educational opportunity,” and “[t]hat teachers be given greater security of tenure.” Id. at 448-49.
While the philosophy of the progressive movement emphasized different themes than the common school movement, the emphasis on education as being critical to democratic values was a constant. As noted by Iowa Superintendent of Public Instruction P.E. McClenahan, “[e]ducation is a function of the state, and popular education is the only means of attaining social, political, and individual freedom.” P.E. McClenahan, Report of the Department of Public Instruction 9 (June 30,1922). .
The emphasis on the need for quality education surfaced again in the post WWII years. In September of 1954, President Eisenhower sent a letter to all state governors calling for statewide conferences on the status of education, and Iowa responded with a statewide conference in Des Moines in December 1954. Letter from Dwight D. Eisenhower to Governors (September 20, 1954) in Program from the Iowa State Conference on Education (Dec. 9-10, 1954). In the 1960s, Iowa’s Department of Public Instruction called for an “educational revolution,” noting that education is no longer “a purely local concern” but “a state responsibility.” Iowa Dep’t of Public Instruction, 63d Biennial Report 16 *58 (1966) (emphasis added). Governor Robert Ray in 1981-1982 served as chair of the Education Commission of the States, an organization dedicated to help states develop effective policies and practices in public education. See Education Commission of the States (Mar. 21, 2012), http://www.ecs. org.
In recent years, there has been what has been labeled a standards and accountability movement in education. In 1983, President Reagan’s Department of Education issued a report entitled, “A Nation at Risk: The Imperative for Educational Reform,” which called for higher standards and more accountability in education generally. In 1989, President George Bush convened a meeting of the nation’s governors in Charlottesville, Virginia to address the perceived shortcomings in education. Recently, a summit on education was held attended by national educational leaders and Iowa educators and administrators. Governor Branstad, who has found inspiration in Robert Lucas’s traditional commitment to education,[33] has proposed important changes to the Iowa education system, which will be the subject of public discussion and potential legislative action in the coming years.
This brief and nonexhaustive overview demonstrates that, in contrast to the federal government, education has played a central role in Iowa state government. While the federal government from time to time has shown an interest in education and has been indirectly involved in fostering it, the states have performed the fundamentally different role of primary provider of education.
From a historical perspective, the provision of education by Iowa state government has been seen as one of its primary and most celebrated functions. Recognition of the centrality and importance of the role of state government in providing education has transcended our political parties and has been passed on from one generation of Iowa political leaders to another up to and including our present political leadership.
III. Relationship of Education to Democratic Government, Personal Liberty, and Human Dignity.
The historical centrality of education to our state cannot be underestimated. In order to fully understand the importance of education, however, a review of the three important functions of education provides additional perspective. First, education is vital to democratic government. Second, education is a prerequisite for meaningful enjoyment of fundamental constitutional rights, including enjoyment of “life, liberty, and property.” Third, it is an essential part of the development of an autonomous personality that is a prerequisite for human dignity.
At the dawn of our nation, de Tocqueville recognized that “the instruction of the people powerfully contributes to the support of a democratic process.” 1 Alexis de Tocqueville, Democracy in America 342 (D. Appleton & Co.1904). Thomas Mann emphasized that education can never be less than such
“as is indispensable for the civil functions of a witness or a juror; as is necessary for the voter in municipal and national affairs; and finally, as is requisite for the faithful and conscientious discharge of all those duties which de *59 volve upon the inheritor of a portion of the sovereignty of this great republic.”
McDuffy v. See’y of Exec. Office of Educ., 415 Mass. 545, 615 N.E.2d 516, 555 (1993) (quoting The Massachusetts System of Common Schools: Tenth Annual Report of the Massachusetts Board of Education 17 (1849)). President Grant drove the point home when speaking in Des Moines on September 25, 1875, when he declared that “the free school is the promoter of that intelligence which is to preserve us as a free nation.” Jacob Armstrong Swisher, Iowa Biographical Series: Leonard Fletcher Parker 69 (1927). Grant further noted that if another contest of national existence were to arrive in the future, it would be “between patriotism and intelligence on the one side, and superstition, ambition and ignorance on the other.” Id. at 69-70.
The relationship of education to democratic government was recognized by John W. Studebaker, a distinguished Iowan who served as Des Moines School Superintendent before being appointed United States Commissioner of Education. Studebaker observed that “good government through democratic processes can be preserved ... only by definitely planned development of the means of public enlightenment.” John W. Studebaker, The American Way: Democracy at Work in the Des Moines Forums 15-16 (1935).
The United States Supreme Court recognized the linkage between education and democracy in San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 36, 93 S.Ct. 1278, 1298, 36 L.Ed.2d 16, 44 (1973), when it noted that democracy depends upon “an informed electorate: a voter cannot cast his ballot intelligently unless his reading skills and thought processes have been adequately developed.” A corollary of the right to vote is the right to be educated so as to exercise that right in an effective manner. See Susan H. Bitensky, Theoretical Foundations for a Right to Education Under the U.S. Constitution: A Beginning to the End of the National Education Crisis, 86 Nw. U.L.Rev. 550, 606 (1992) [hereinafter Bitensky].
Certainly the parade of Iowa’s governors cited earlier would wholeheartedly endorse the concept that education is critically important to the functioning of democratic government. Today, without an educated people, spectacle, celebrity culture, escalating emotional outburst, and demand for instant gratification will replace rationality, tolerance, and mutual respect in the voting booths and in the public square.
In addition, education is now critical to meaningful enjoyment of life in Iowa and the United States. The prospects of a person who is uneducated are now marginal at best. Farming is increasingly industrialized and requires knowledge of markets, fertilizers, hybrids, arid planning techniques. Manufacturing jobs are no longer unskilled, but require sophisticated knowledge, training, and skills. Ditches are no longer dug by hand. If a citizen is to have a meaningful right to enjoy the constitutionally protected interests in life, liberty, and property, the citizen must have an adequate education. Justice Cardozo captured the idea in his typically lyrical prose:
“We are free only if we know, and so in proportion to our knowledge. There is no freedom without choice, and there is no choice without knowledge — or none that is not illusory. Implicit, therefore, in the very notion of liberty is the liberty of the mind to absorb and to beget.”
Bitensky, 86 Nw. U.L.Rev. at 550 (quoting Benjamin N. Cardozo, The Paradoxes of Legal Science 104 (photo reprint 1982) (1928)).
The importance of education in empowering individuals to participate meaningfully in life did not escape school officials in *60 Iowa small towns. For instance, the bold statement “Knowledge is Power” was emblazoned on the third story of a school house in Persia, Iowa in 1885. See Camilla Dieber and Peggy Beedle, Country Schools for Iowa 9 (2002).
Finally, education is essential to the development of an autonomous individual that is the essence of human dignity. The Universal Declaration of Human Rights, which has been ratified by the United States, declares that the right to education is a human right and that the purpose of the human right is to provide for the “full development of the human personality.” Universal Declaration of Human Rights, G.A. Res. 217(111) A, art. 26, § 2, U.N. Doc. A/RES/217(III) (Dec. 10, 1948).[34] As one commentator has noted, education “takes on the status of a human right because it is integral to and enhances human dignity through its fruits of knowledge, wisdom, and understanding” and “a prerequisite for individuals to function as fully human beings in modern society.” Richard Pierre Claude, The Right to Education and Human Rights Education, in Human Rights in the World Community: Issues and Actions 211 (Richard Pierre Claude & Burns H. Veston eds., 3d ed.2006). A lack of education severely undermines the capacity of the individual to make meaningful life choices with respect to marriage and family, self-expression, political voice, religious observance, and economic role and ambition.[35]
*61 I am firmly convinced that education is not just an important interest. It is a one-of-a-kind interest. It goes to the very heart of democratic government, to the essence of enjoyment of life itself, and to the core of human dignity. Without edu *62 cation, our democratic government will be undermined, the quality of life will deteriorate beyond recognition, and the realization of autonomous personality required for human dignity will become virtually impossible.
IV. Overview of Iowa Constitutional Provisions.
A. Positive Educational Provisions of the Iowa Constitution. As indicated above, the United States Constitution says nothing about education. This is not surprising since it was universally assumed by the founders that the education of children and youth was the obligation of the state and local government.
Article IX of the Iowa Constitution of 1857 dealing with education contains two divisions. The first division provides, among other things, that “[t]he educational interest of the State, including Common Schools ... shall be under the management of a Board of Education.” Iowa Const, art. IX, div. 1, § 1. The board was required to “provide for the education of all the youths of the State, through a system of Common Schools.” Id. art. IX, div. 1, § 12.
Article IX of the 1857 Iowa Constitution also contains a second division. The first sentence of section three of the second division parallels the substantive provisions of the 1846 constitution by providing that “[t]he General Assembly shall encourage, by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvement.” Id. art. IX, div. 2, § 3.
The second sentence of section three is more complicated than the first sentence. It provides, in relevant part, that the federal funds, funds from estates with no heirs, and funds that the general assembly may provide, “shall be inviolably appropriated to the support of Common schools throughout the State.” Id.
During the debates surrounding the education articles in the 1857 constitution, the convention rejected a proposal that schools should be “free of charge and equally open to all.” 2 Debates at 825. The reason for this rejection, however, was not based on a view that education was not fundamentally important, but instead to ensure that schools in Iowa could be racially segregated. Mr. Gillaspy, an opponent to the provision, declared that “[i]f the people of this state are disposed to appropriate money for the education of the blacks, let them do it in separate and distinct schools....” Id. In response, William Penn Clark declared that “our duty goes for providing every child in the State with an education.” Id. at 826. Eventually, a substitute amendment was offered that provided “for the education of all the youths of the state, through a system of common schools.” Id. at 935. Thus, while the rejection of the proposed provision that schools be “free of charge and equally open to all” demonstrates the racial prejudices held by some members of the constitutional convention, it does not in any way undercut the importance the Iowa framers placed on accessible public education generally.
Article IX, division one, section fifteen provided the general assembly with an escape from vesting responsibility for education in the hands of an independent board of education. Under section fifteen, the general assembly was vested with the power after 1863 “to abolish or reorganize said Board of Education, and provide for the educational interest of the State in any other manner that to them shall seem best and proper.” Iowa Const, art. IX, div. 1, § 15. In 1864, the general assembly did just that. As a result, the constitutional provisions of article IX, division one, sec *63 tion one, vesting the power to provide education in the board of education have no current effect.
The question arises what we should make of the action of the general assembly abolishing the board of education. It is clear that the action renders inoperative the constitutional provisions vesting power over education with the board of education, including the provision that “[t]he Board of Education shall provide for the education of all the youths ... through a system of Common Schools.” See id. art IX., div. 1, § 12 (emphasis added). While the board’s constitutional duty to maintain common schools was clearly repealed, the duty of the state to “provide for the educational interest,” which by definition included “Common Schools,” was not affected. See id. art. IX, div. 1, §§ 1,15.
That the only effect of the legislative abolition of the board of education was to shift responsibilities for the provision of education as required by article IX is demonstrated by the case of Clark v. Board of Directors, 24 Iowa 266 (1868). Clark, which was decided four years after the abolition of the board, addressed the validity of racial segregation in Iowa public schools. Clark, 24 Iowa at 269-70. In concluding that racial segregation in public schools was unlawful, we cited and relied upon article IX, division 1, section 12, which provides that the board of education shall provide “ ‘for the education of all the youths of the State, through a system of common schools.’ ” Id. at 274 (quoting Iowa Const, art. IX, div. 1, § 12). Clearly, the 1864 abolition of the board of education did not affect the substantive requirements contained in article IX, but merely shifted authority by abolishing the board and creating a Superintendent of Public Instruction. See id.; 1864 Iowa Acts ch. 52, §§ 1-2, 5 (declaring that “the Board of Education of the State of Iowa is hereby abolished,” providing for a Superintendent of Public Instruction, and charging the Superintendent with the general supervision of “all the Common Schools of the State”); see also Hume v. Indep. Sch. Dist., 180 Iowa 1233, 1241, 164 N.W. 188, 191 (1917) (citing but not relying on article IX, division 1, section 12); Burdick v. Babcock, 31 Iowa 562, 571 (1871) (Cole, J., concurring) (stating “[o]ur constitution has clothed the legislature with the power, and has expressly devolved upon it the duty of ‘providing for the education of all the youths of the State through a system of common schools’ ” (quoting Iowa Const, art. IX, div. 1, § 12)).
The ongoing obligation of the state is also reflected in the language of article IX, sections one and fifteen, but also demonstrated by the provisions of article IX, division two, section three, which provides for a “perpetual fund” that is “inviolably appropriated to the support of Common schools throughout the State.” Iowa Const, art. IX, div. 2, § 3. It would make no sense to have a “perpetual fund” that is “inviolably appropriated to the support of Common schools throughout the State” if the state, in its discretion, could abolish common schools. See id. (emphasis added).
Thus, the Iowa Constitution requires a system of common schools to educate all youths throughout the state, but in terms of the management of such common schools, it allows the general assembly to “provide for the educational interest of the State” in a manner other than through the board of education. See id. art. IX, div. 1, § 15. After 1863, the legislature was free to choose to manage its common schools through a superintendent of public instruction, a department of education, a committee of scholars, or in “any other manner that to them shall seem best and proper.” See id.
*64 The explicit Iowa constitutional provisions related to “provid[ing] for the education of all the youths of the State, through a system of Common Schools” and advancing “the educational interest of the State, including Common Schools,” stand in stark contrast to the complete lack of explicit provisions in the United States Constitution related to education and reflect the fundamentally different traditional roles of state and federal governments when it comes to the education of children and youth. The Federal Constitution is generally a limited constitution with the federal government only granted powers specifically authorized. In contrast, the states have plenary legislative authority and have positive commitments in the constitutional frameworks. In Iowa, one of the positive commitments in the Iowa Constitution is to the educational mission. Scholars have suggested that the positive rights tradition of state constitutions differs markedly from the negative rights tradition of federal constitutional analysis. See Helen Hershkoff, Positive Rights and State Constitutions: The Limits of Federal Rationality Review, 112 Harv. L.Rev. 1131, 1134-37 (1999) [hereinafter Hersh-koff]. While the enforcement of negative rights contained in the United States Constitution generally has not required affirmative action by government, DeShaney v. Winnebago Cnty. Dep’t of Soc. Sens., 489 U.S. 189, 199, 109 S.Ct. 998, 1006, 103 L.Ed.2d 249, 261 (1989), quite the opposite is true with respect to positive obligations of state governments that, by definition, require the state to take affirmative action to meet its constitutional responsibilities.
B. Privileges and Immunities Clause of the Iowa Constitution. The Iowa Constitution has a privileges and immunities clause. The provision is found in article I, section 6. This section provides:
All laws of a general nature shall have a uniform operation; the General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms shall not equally belong to all citizens.
Iowa Const, art. I, § 6. The Iowa privileges and immunities clause predates the Federal Privileges and Immunities and Equal Protection Clauses of the Fourteenth Amendment.
There has been much written about the relationship between state privileges and immunities clauses and the Federal Equal Protection Clause.[36] While the privileges and immunities clauses have generally not been construed narrowly, there is the notion that privileges and immunities clauses were designed, in part, to prevent narrow classes of people from getting special advantages from government, what might be in today’s popular parlance be called crony capitalism.
To Iowa’s first Territorial Governor Robert Lucas, however, the privileges and immunities clause of the Northwest Ordinance was linked to the right of citizens to obtain an education. In his first inaugural speech, Lucas juxtaposed the privileges and immunities clause with his comments upon the need to develop education in the territory. 1 Shambaugh at 78. Lucas saw *65 the right to education as among the “privileges” of citizens of the Iowa territory.
In the nineteenth century, the United States Supreme Court was inhospitable to claims brought under the Privileges and Immunities Clause and the related Equal Protection Clause in the Federal Constitution. In The Slaughter-House Cases, 83 U.S. (16 Wall.) 36, 21 L.Ed. 394 (1872), the Court gave the Federal Privileges and Immunities Clause of the Fourteenth Amendment an extraordinarily narrow interpretation. In Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), the United States Supreme Court announced the separate but equal doctrine, which stood as law for over fifty years until it was finally overturned in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). While the United States Supreme Court was minimizing the Federal Privileges and Immunities Clause and narrowly interpreting equal protection, however, the Iowa Supreme Court was breathing life and meaning into state constitutional provisions related to equality-
The dramatic story begins prior to statehood. In its first reported case, In re Ralph, 1 Morris 1 (Iowa 1839), the Supreme Court of the Territory of Iowa held that a slave who was voluntarily permitted to leave Missouri and travel to Iowa was a free man as the law should “extend equal protection to men of all colors and conditions.” In re Ralph, 1 Morris at 6. This holding, of course, was the precise opposite of the approach taken by the United States Supreme Court in Dred Scott v. Sandford, 60 U.S. (19 How.) 393, 15 L.Ed. 691 (1856), twenty years later.
After statehood, the tradition of In re Ralph was extended in Clark As discussed above, Clark held that a person cannot be denied admission to a public school on account of race. Clark, 24 Iowa at 274. Although Clark was based on statutory grounds, the decision included sweeping language with constitutional overtones. Id. at 277. In Coger v. Northwestern Union Packet Co., 37 Iowa 145, 153-55 (1873), this court, relying upon article I, section 1 of the Iowa Constitution, refused to endorse the separate but equal doctrine and instead held that persons of color were entitled to be admitted as a steamboat passenger on equal terms to white patrons. See Iowa Const, art. I, § 1 (1857) (“All men are, by nature, free and equal”).
Since the very beginning, we have interpreted Iowa’s privileges and immunities clause in a fashion dramatically different than the interpretation offered by the United States Supreme Court in The Slaughter-House Cases. In more recent years, we have often looked to federal equal protection precedent for its persuasive power in interpreting our privileges and immunities provision. Callender v. Skiles, 591 N.W.2d 182, 187 (Iowa 1999). We have, however, jealously guarded our right to engage in analysis under the Iowa Constitution that is independent from the interpretations of the United States Supreme Court under the Federal Equal Protection Clause. Chi. Title Ins. Co. v. Huff, 256 N.W.2d 17, 23 (Iowa 1977); Davenport Water Co. v. Iowa State Commerce Comm’n, 190 N.W.2d 583, 593 (Iowa 1971), superseded by statute, Iowa Code § 17A.19(7) (1975),. as recognized in Interstate Power Co. v. Iowa State Commerce Comm’n, 463 N.W.2d 699, 702 (Iowa 1990). On a number of occasions, we have departed from directly applicable federal precedent and engaged in independent analysis. See, e.g., Racing Ass’n of Cent. Iowa v. Fitzgerald (RACI), 675 N.W.2d 1, 7 (Iowa 2004); Bierkamp v. Rogers, 293 N.W.2d 577, 581-82 (Iowa 1980). When federal precedent was lacking, we have relied on state constitutional grounds to decide im *66 portant issues. See Vamum v. Brien, 763 N.W.2d 862, 906 (Iowa 2009).
Our independent role in our application of equal protection concepts pursuant to the privileges and immunities clause of the Iowa Constitution is a firmly established feature of our legal tradition from the very first days of statehood, is consistent with the evolving law in other states, and is part of a celebrated tradition in Iowa.
C. Substantive Due Process of the Iowa Constitution. The plaintiffs make a substantive due process claim under article I, section 9 of the Iowa Constitution. Article I, section 9 states, in relevant part, that “no person shall be deprived of life, liberty, or property, without due process of law.” Iowa Const, art. I, § 9.
The Iowa constitutional provision is parallel to a similar provision of the Fifth and Fourteenth Amendments of the United States Constitution. As with other state constitutional provisions, we zealously guard our ability to interpret the Iowa Constitution differently than the interpretations of the United States Supreme Court under the federal due process provision. State v. Feregrino, 756 N.W.2d 700, 704 n. 1 (Iowa 2008).
In Meyer v. Nebraska, 262 U.S. 390, 403, 43 S.Ct. 625, 628, 67 L.Ed. 1042, 1046-47 (1923), the United States Supreme Court overturned a conviction of a school teacher who taught foreign languages in public schools. In passing, the Court identified the right to acquire useful knowledge as a liberty interest protected by the Fourteenth Amendment. Meyer, 262 U.S. at 399-400, 43 S.Ct. at 626-27, 67 L.Ed. at 1045. While not overruled, the outcome in Meyer was based on due process methodology of the Lochner era and may not be reliable precedent.
The United States Supreme Court, however, has employed substantive due process in a number of contexts in more recent years that may be instructive in the present case. For instance, in Youngberg v. Romeo, 457 U.S. 307, 324, 102 S.Ct. 2452, 2462, 73 L.Ed.2d 28, 42-43 (1982), the Supreme Court declared that persons subject to civil commitment “enjoy[] constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by those interests.” Justice Blackmun’s opinion in Jackson v. Indiana, 406 U.S. 715; 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435, 450-51 (1972), suggested that due process requires that the nature and duration of commitment must have a reasonable relationship to the reasons for commitment.
A case of potential significance is Wyatt v. Aderholt, 503 F.2d 1305 (5th Cir.1974). Aderholt involved a class action alleging that a state school designed to habilitate the mentally handicapped was not providing meaningful care. Aderholt, 503 F.2d at 1306. Judge Wisdom characterized the issue as whether “federal district courts have the power to order state mental institutions to provide minimum levels of psychiatric care and treatment to persons civilly committed to the institutions.” Id. The Aderholt court unanimously decided the question in the affirmative. Id. at 1319. It rejected the claims of Governor George Wallace that providing adequate treatment for persons civilly confined was a question of available funds. Id. at 1317-19.
In light of these analogies, it can be asserted that, because education is compulsory, it involves liberty and its deprivation triggers a due process right that the infringement of liberty be reasonably related to the intended purpose, namely, education. See Bitensky, 86 Nw. U.L.Rev. at 596 n. 277; Gershon M. Ratner, A New Legal Duty For Urban Public Schools: Effective Education in Basic Skills, 63 *67 Tex. L.Rev. 777, 823-28 (1985) [hereinafter Ratner]; Note, A Right to Learn? Improving Educational Outcomes Through Substantive Due Process, 120 Harv. L.Rev. 1323, 1328-32 (2007).
Our prior precedents recognize a due process interest in adequate education. In Exira Community School District v. State, 512 N.W.2d 787, 796 (Iowa 1994), we noted that a student has a due process right to an “adequate education.” Thus, a finding in this case that there is a due process right under the Iowa Constitution would not be breaking new theoretical ground, but simply applying the tools present in existing precedent.
V. Overview of Education Cases.
A. Introduction. In this section, I provide an overview of two important cases related to education, Serrano v. Priest, 5 Cal.3d 584, 96 CaLRptr. 601, 487 P.2d 1241 (1971) (Serrano I), and San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). These cases set the stage for a more detailed analysis of the rich sources of state constitutional law regarding educational issues.
The survey will show that, even if this court were to apply the San Antonio framework for determining whether an interest is “fundamental” for equal protection purposes, such a fundamental interest would be present in light of the explicit Iowa constitutional provisions related to education. Further, the survey will show that, while the cases are divided, many state supreme courts have found a fundamental interest in education because of the strong historical role of state government in providing education to children and because of the critical functional role of education in a democratic government.
B. The California State Supreme Court Decision in Serrano I.
1. Introduction. The first major case to consider a challenge to a state system of education on equal protection grounds was Serrano I. In Serrano I, school children and their parents challenged the constitutionality of public school financing in the State of California. Serrano I, 96 Cal.Rptr. 601, 487 P.2d at 1244. The plaintiffs claimed that reliance on property taxes to fund public schools caused substantial disparities in the quality and nature of educational opportunities available to them. Id. The district court granted the defendants’ demurrer (motion to dismiss) and the plaintiffs appealed. Id. at 1245.
2. California’s education clause. The Serrano I court rejected the claim that California’s funding of public schools violated the education clause of the California Constitution. Id. at 1249; see Cal. Const, art. IX, § 5. The court held that while California was required to maintain a “system” of common schools, a “system” of common schools meant only a prescribed course of study and educational progression from grade to grade. Serrano I, 96 Cal.Rptr. 601, 487 P.2d at 1248-49. The Serrano I court reasoned that the education clause, standing alone, did not require equality of spending. Id.
3. Equal protection under the Fourteenth Amendment. The Serrano I court next turned to the claim that California’s education system violated the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. Citing the poll tax case of Harper v. Virginia State Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), the court concluded that the reliance on property taxes that produced financial disparities available to school districts amounted to a classification based upon wealth of the district. Serrano I, 96 Cal.Rptr. 601, 487 *68 P.2d at 1250. The court rejected the state’s argument that because the discrimination was based on district wealth, no equal protection claim could be brought. Id. at 1251-52. The court further concluded that when a classification was based on wealth, no allegation of purposeful or intentional discrimination was required. Id. at 1258-55. The court noted that in Harper, the poll tax was neutral on its face but was clearly discriminatory in effect. Id. at 1254. The court further noted that while the United States Supreme Court had not yet weighed in on the issue, the California Supreme Court had previously held that de facto racial segregation violated the Fourteenth Amendment. Id. at 1255 (citing S.F. Unified Sch. Dist. v. Johnson, 3 Cal.3d 937, 92 Cal.Rptr. 309, 479 P.2d 669 (1971), and Jackson v. Pasadena City Sch. Dist., 59 Cal.2d 876, 31 Cal.Rptr. 606, 382 P.2d 878 (1963)).
The Serrano I court also addressed the question of whether the asserted educational interest of the plaintiffs amounted ■to a fundamental interest for purposes of equal protection analysis. Serrano I, 96 Cal.Rptr. 601, 487 P.2d at 1255-59. The court noted that education plays an indis-pensible role in modern industrial society in two respects. Education, according to the court, “is a major determinant of an individual’s chances for economic and social success.” Id. at 1255-56. Second, education has “a unique influence on a child’s development as a citizen and his participation in political and community life.” Id. at 1256. The court compared education with other fundamental rights such as the right to have a free transcript or a court appointed lawyer. Id. at 1257-58. The court concluded that education compared favorably in importance. Id. According to the court, education, aside from reducing the crime rate, supports “each and every other value of a democratic society — participation, communication, and social mobility, to name but a few.” Id. at 1258 (citing the seminal work of John E. Coons, William H. Clune III & Stephen D. Sugarman, Educational Opportunity: A Workable Constitutional Test for State Financial Structures, 57 Cal. L.Rev. 305 (1969)).
Having determined that the financing scheme in California discriminated against school districts on the basis of wealth and affected fundamental interests, the Serrano I court proceeded to apply a compelling state interest standard to determine its validity. Serrano I, 96 Cal.Rptr. 601, 487 P.2d at 1259-63. Not surprisingly, the court found the scheme invalid under the demanding test. Id. at 1263. The court rejected the asserted state interest of local control, noting that local control could be preserved regardless of the method of financing public education. Id. at 1260. With respect to the claim that the system encouraged decentralized decision making at the local level, the court found that “such fiscal freewill is a cruel illusion for the poor school districts.” Id. According to the court,
so long as the assessed valuation within a district’s boundaries is a major determinant of how much it can spend for its schools, only a district with a large tax base will be truly able to decide how much it really cares about education.
Id. A poor district, according to the court, cannot tax itself into an excellence that its tax rolls cannot provide. Id.
4. Privileges and immunities and uniformity clauses of the California Constitution. While the Sen~ano I court focused primarily on the Equal Protection Clause of the Fourteenth Amendment, footnote eleven of the opinion indicated that a violation of the California .Constitution article I, sections 11 and 21 were also present. Id. at 1249 n. 11. Section 11 provided that “ ‘[a]ll laws of a general nature shall have a uniform operation,”’ *69 while section 21 provided that “ ‘[n]o special privileges or immunities shall ever be granted ... nor shall any citizen, or class of citizens, be granted privileges or immunities which, upon the same terms, shall not be granted to all citizens.’ ” Id. (quoting article I, sections 11 and 21 of the California Constitution). The Serrano I court observed in the footnote that ordinarily the court construed these state provisions as “‘substantially the equivalent’ of the equal protection clause of the Fourteenth Amendment.” Id. (quoting Dep’t of Mental Hygiene v. Kirchner, 62 Cal.2d 586, 43 Cal.Rptr. 329, 400 P.2d 321, 322 (1965)).
5. Summary. As a result, the Serrano I court reversed the dismissal of the action by the trial court primarily on federal constitutional grounds. On remand, the court stated that the district court should engage in further proceedings, and if it entered judgment against the defendants, it could do so “in such a way as to permit an orderly transition from an unconstitutional to a constitutional system of school financing.” Id. at 1266.
C. Federal Developments: San Antonio.
1. Introduction. The United States Supreme Court took up the issue of disparities of education in San Antonio. In this case, school children and their parents brought a class action on behalf of all children who live in school districts with low property valuations attacking the Texas method of financing public education. Rodriguez v. San Antonio Indep. Sch. Dist., 337 F.Supp. 280, 281 (W.D.Tex.1971).
After a trial in which testimony and documentary evidence was presented, a three judge panel of district court judges, relying in part on Serrano I, concluded that the plaintiffs had demonstrated that the Texas scheme of financing public education violated the Equal Protection Clause of the Fourteenth Amendment. Id. Noting that wealthy school districts had more educational options than poorer ones, the district court concluded that “the quality of public education may not be a function of wealth, other than the wealth of the state as a whole.” Id. at 284. By a narrow 5-4 margin, the United States Supreme Court reversed the district court. San Antonio, 411 U.S. at 6, 93 S.Ct. at 1282, 36 L.Ed.2d at 27.
2. Focus of San Antonio: Does strict scrutiny apply to parity claims under the Equal Protection Clause? In an opinion by Justice Powell, the San Antonio majority first concluded that the plaintiffs failed to make a showing of wealth discrimination sufficient to trigger strict scrutiny. Id. at 22-23, 93 S.Ct. at 1291, 36 L.Ed.2d at 36-37. The San Antonio majority concluded that the class of persons in the school districts attended by plaintiffs was ill defined. Id. Although the school districts generally had less wealth, students within the school districts were not uniformly poor. Id. According to the San Antonio majority, there was no basis in the record to conclude that the poorest people were concentrated in the poorest districts. Id. at 23; 93 S.Ct. at 1291, 36 L.Ed.2d at 37 (emphasis added). As a result, the class of plaintiffs was not sufficiently related to wealth to trigger strict scrutiny.
In reaching its conclusion, the San Antonio majority noted that ho claim had been made that the plaintiffs suffered “an absolute deprivation of the desired benefit.” Id. The San Antonio majority emphasized that “the Equal Protection Clause does not require absolute equality or precisely equal advantages.” Id. at 24, 93 S.Ct. at 1291, 36 L.Ed.2d at 37. The San Antonio majority further observed that Texas authorities asserted the plaintiffs were receiving an “adequate” edu *70 cation and that “[n]o proof was offered at trial persuasively discrediting or refuting the State’s assertion.”[37] Id. at 24, 98 S.Ct. at 1292, 36 L.Ed.2d at 38.
In contrast to the California Supreme Court in Serrano I, the San Antonio majority also determined that while education was an important interest, it did not amount to a fundamental interest under the Federal Constitution. Citing Brown, the San Antonio majority recognized “the vital role of education in a free society.” Id. at 30, 93 S.Ct. at 1295, 36 L.Ed.2d at 41. Yet, the Court noted the power of the dissent in Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), in which Justice Harlan cautioned that fundamental rights doctrine should not extend to “ ‘[virtually every state statute’ ” that affects important rights. Id. at 31, 93 S.Ct. at 1295, 36 L.Ed.2d at 41 (quoting Shapiro, 394 U.S. at 661, 89 S.Ct. at 1345, 22 L.Ed.2d at 631 (Harlan, J., dissenting), overruled in part on other grounds by Edelman v. Jordan, 415 U.S. 651, 671, 94 S.Ct. 1347, 1359-60, 39 L.Ed.2d 662, 677 (1974)).
In order to cabin the fundamental rights doctrine, the San Antonio majority held that a fundamental right under the Federal Equal Protection Clause is one that is explicitly or implicitly afforded protection in the United States Constitution. Id. at 33, 93 S.Ct. at 1297, 36 L.Ed.2d at 43. Fundamental rights under the Federal Constitution thus do not arise from an “ad hoc determination as to the social or economic importance of that right.” Id. at 32, 93 S.Ct. at 1296, 36 L.Ed.2d at 42.
The San Antonio majority’s test of what amounts to a fundamental interest is noteworthy because it highlights the difference between Federal and State Constitutions. Under the test of the San Antonio majority, it is clear that education is not a fundamental interest under the Federal Constitution because nowhere is education explicitly or implicitly mentioned in the text. The opposite, of course, is true of state constitutions, which routinely contain explicit constitutional provisions relating to education that invariably include a duty to provide education to its citizens. A state court desiring to follow the San Antonio formulation for determining whether an interest is fundamental would be compelled to find such an interest in light of the prominent and explicit role of education in the state constitution.
As in its discussion regarding the question of whether the plaintiffs demonstrated discrimination on the basis of wealth, the San Antonio majority emphasized in its discussion of fundamental interests that “[e]ven if it were conceded that some identifiable quantum of education is a constitutionally protected prerequisite to the meaningful exercise of either right” there was no indication in the record that the present level of expenditures in the schools which the plaintiffs attended fell short. Id. at 36-37, 93 S.Ct. at 1298-99, 36 L.Ed.2d at 45. The San Antonio majority noted that “no charge fairly could be made that the system fails to provide each child with an opportunity to acquire the basic minimum skills necessary for the enjoyment of the rights of speech and of full *71 participation in the political process.” Id. at 37, 93 S.Ct. at 1299, 36 L.Ed.2d at 45.
3. Impact of federalism and deference to states. The San Antonio majority noted that “a century of Supreme Court adjudication under the Equal Protection Clause affirmatively supports” the application of a rational basis test to the Texas educational finance structure. Id. at 40, 93 S.Ct. at 1300, 36 L.Ed.2d at 47. The San Antonio majority stressed that the field of taxation had been a traditional- area of deference. Id. Further, the Sm Antonio majority recognized that the field of education involved a number of complex issues that ordinarily should be left to the legislative process. Id. at 42-43, 93 S.Ct. at 1301-02, 36 L.Ed.2d at 48^9.
Any Supreme Court review of legislation involves deference issues, and many constitutional questions before the Court can be quite complex. What made the case especially troubling to the San Antonio majority was the strong federalism concerns underlying its conclusion that strict scrutiny of state school finance laws was inappropriate. The San Antonio majority noted the implications of the case for the relationship between national and state power under the federal system. Id. at 44, 93 S.Ct. at 1302, 36 L.Ed.2d at 49. The San Antonio majority declared “it would be difficult to imagine” a case with greater impact on the federal system than the case before the Court in which the Court is urged to “abrogate systems of financing public education presently in existence in virtually every State.” Id. ■
4. Application of rational basis test. After determining that the proper standard of review was the traditional rational basis standard, the San Antonio majority proceeded to consider the merits of the plaintiffs’ claim. The three judge district court had concluded based on a substantial record that the Texas system failed even “to establish a reasonable basis” for a system that results in different levels of per pupil expenditure. Rodriguez, 337 F.Supp. at 284.
The San Antonio majority disagreed with the district court, concluding that local control provided a sufficient rational basis for the funding scheme. The San Antonio majority emphasized that the Texas system of school finance assured “a basic education” for every child in the state. San Antonio, 411 U.S. at 49, 93 S.Ct. at 1305, 36 L.Ed.2d at 52. Local control, according to the San Antonio majority, is vital to continued public support for education, and it means the freedom to devote more funds to education through local taxes. Id. at 49-50, 93 S.Ct. at 1305, 36 L.Ed.2d at 52. The San Antonio majority noted that while poor school districts had reduced ability to make free decisions regarding how much they spend on education, they still “retain under the present system a large measure of authority as to how available funds will be allocated.” Id. at 51, 93 S.Ct. at 1306, 36 L.Ed.2d at 53. The state’s interest in maintenance of local control in education thus satisfied the rational basis test under the Federal Equal Protection Clause.
5. Dissents. The majority opinion in San Antonio drew dissents from Justices Brennan, White, and Marshall. Justice Brennan challenged the holding of the majority that education did not amount to a fundamental interest. He noted that education was inextricably linked to constitutional rights of voting and free speech and that, as a result, education amounted to a fundamental interest for purposes of equal protection.- Id. at 62-63, 93 S.Ct. at 1312, 36 L.Ed.2d at 60 (Brennan, J., dissenting).
Justice White attacked the majority’s conclusion that local control justified the Texas finance scheme. Id. at 64-65, 93 S.Ct. at 1312-13, 36 L.Ed.2d at 61-62 (White, J., dissenting). He asserted that *72 while local control might be a valid state interest, the means chosen by Texas did not advance it. Specifically, Justice White noted that districts with a low tax base did not have an effective local option choice of increasing funds available for education. Id. He further concluded that a class was obviously present for equal protection purposes, namely, the persons who find themselves in a low property value school district. Id. at 69, 93 S.Ct. at 1315, 36 L.Ed.2d at 64.
Justice Marshall, joined by Justice Douglas, provided the lengthiest dissent. He found it an inescapable fact that if one school district has more funds available per pupil than another, the former will have a greater.choice in educational planning than, the latter. Id. at 83-84, 93 S.Ct. at 1322, 36 L.Ed.2d at 72 (Marshall, J., dissenting). He attacked the majority’s notion that Texas provided an “adequate” education, noting that the Court had never before suggested that because some “adequate” level of benefits is provided to all, discrimination in the provision of services is acceptable. Id. at 88-89, 93 S.Ct. at 1325, 36 L.Ed.2d at 74-75. He rejected the rigidified tiered approach to equal protection, calling instead for the adoption of a more flexible test that balanced the interests of the party challenging the classification against the state’s purported interest in sustaining the statute. Id. at 98-110, 93 S.Ct. at 1330-36, 36 L.Ed.2d at 81-88. In any event, Justice Marshall concluded that education certainly was a “fundamental” interest in light of its unique status in society and its nexus with other protected constitutional rights. Id. at 111, 93 S.Ct. at 1336-37, 36 L.Ed.2d at 88.
6. ' Summary. The San Antonio majority rejected a federal equal protection claim when the plaintiff sought parity in educational expenditures. The San Antonio majority was particularly concerned that if strict scrutiny would apply to such sweeping claims, thousands of state statutes would be invalidated. The Court expressly reserved the question, however, of whether strict scrutiny would apply where a state deprived children of an adequate education.
Further, the San Antonio Court adopted a standard for determining whether an asserted interest or right is fundamental. While not binding on a state court, the methodology, if followed, would lead to the conclusion that education, which is the subject of explicit state constitutional provisions, is a fundamental interest for equal protection purposes.
D. The California State Court Response: Serrano II. After San Antonio, the California Supreme Court in Serrano v. Priest, 18 Cal.3d 728, 135 Cal.Rptr. 345, 557 P.2d 929 (1976) (Serrano II), was asked to reconsider its decision that the California system of financing education was constitutionally infirm. During the trial proceedings resulting from Serrano I, San Antonio was decided. The trial court, however, concluded that the financing scheme violated the privileges and immunities and uniform laws clauses of the California Constitution. Serrano II, 135 Cal. Rptr. 345, 557 P.2d at 931. The defendants appealed. Id.
' In Serrano II, the California Supreme Court declined to follow San Antonio in its interpretation of the state constitution. Id., 135 Cal.Rptr. 345, 557 P.2d at 951. The Serrano II court emphasized that while the state equal protection provisions were “substantially the equivalent” of the guarantees of the Fourteenth Amendment, they possessed “an independent vitality which, in a given case, may demand an analysis different from that which would obtain if only the federal standard were applicable.” Id., 135 CaLRptr. 345, 557 P.2d at 950. The Serrano II court noted that considerations of federalism, which played an important part in San Antonio, *73 had no application to the judgment of a state supreme court. Id., 135 CaLRptr. 345, 557 P.2d at 948^49. Further, while the Serrano II court did not claim expertise on school financing, it noted it had the benefit of 4000 pages of testimonial transcript, replete with the opinions of experts, and exhaustive findings of the district court. Id., 135 CaLRptr. 345, 557 P.2d at 952. In determining whether a right is “fundamental” for purposes of the California equal protection clause, the Serrano II court rejected the San Antonio test. Id. Instead, the Serrano II court declared that it would determine which legislative classifications were subject to strict scrutiny based upon the impact on those rights and liberties which “lie at the core of our free and representative form of government.” Id.
E. Subsequent Education Cases Based on State Constitutions.
1. Overview of state court cases subsequent to San Antonio. After Serrano I, San Antonio, and Serrano II, a significant number of states considered challenges to state schemes of providing education. Plaintiffs challenging state educational frameworks in state courts generally launched double-barreled attacks.[38] First, plaintiffs claimed that the educational structures violated the state education clauses in the state constitutions. Second, the plaintiffs asserted that the state education schemes violated equal protection under the state constitutions. These theories, while pled separately, often operated in tandem with one another. • In a few states, plaintiffs have also included challenges to educational structures based on substantive due process.[39]
While the cases often turn upon the specific language of statutes and the nature of the factual records that are developed, the post-Sim Antonio state supreme court cases in which plaintiffs challenging state educational frameworks prevail are in the majority,[40] while those denying re *74 lief constitute a substantial minority.[41] Interestingly, the jurisdictions where state supreme courts have departed from San Antonio include Texas, where the state supreme court invalidated the same school financing arrangements that the United States Supreme Court approved in San Antonio. See Edgewood Indep. Sch. Dist. v. Kirby, 111 S.W.2d 391, 892 (Tex.1989). In the minority of cases lost by plaintiffs, some may be characterized as providing mixed results, such as where the courts recognized or at least reserved the possibility of a successful claim but found the facts insufficient to support them.[42] Many of the cases also triggered strong dissents.[43]
Many of the decisions are also based upon extensive records developed by trial courts.[44] In some cases where the trial courts dismissed education claims without developing an evidentiary record, reversal has occurred. See, e.g., Idaho Sch. for Equal Educ. Opportunity v. Evans, 850 P.2d 724, 734-35 (Idaho 1993).
2. Obstacles to judicial review: Political question and justiciability doctrines. The post-Sau Antonio state court cases have considered a number of obstacles to judicial review. The main obstacles are the political question doctrine and the related doctrine of justiciability.
With respect to the political question doctrine, state courts receptive to edu *75 cation claims have generally found that courts have a duty to decide cases brought before them by the parties. The duty of courts to declare what the law is has sometimes been expressed in forceful terms. For example, the Kentucky Supreme Court in Rose declared that “[t]o avoid deciding the case because of ‘legislative discretion’ ... would be a denigration of our own constitutional duty. To allow the General Assembly ... to decide whether its actions are constitutional is literally unthinkable.” Rose v. Council for Better Educ., Inc., 790 S.W.2d 186, 209 (Ky.1989). Similarly, in DeRolph v. State, the Ohio Supreme Court declared:
We will not dodge our responsibility by asserting that this case involves a non-justiciable political question. To do so is unthinkable. We refuse to undermine our role as judicial arbiters and to pass our responsibilities onto the lap of the General Assembly.
78 Ohio St.3d 193, 677 N.E.2d 733, 737 (1997); see also Conn. Coal. for Justice in Educ. Funding, Inc. v. Rell, 295 Conn. 240, 990 A.2d 206, 223 (2010) (noting “ ‘it is well within the province of the judiciary to determine whether a coordinate branch of government has conducted itself in accordance with ‘the authority conferred upon it by the constitution’ ” (quoting Office of the Governor v. Select Comm. of Inquiry, 271 Conn. 540, 858 A.2d 709, 730 (2004))); Evans, 850 P.2d at 734 (“[W]e decline to accept the respondents’ argument that the other branches of government be allowed to interpret the constitution for us. That would be an abject abdication of our role in the American system of government.”); McDaniel v. Thomas, 248 Ga. 632, 285 S.E.2d 156, 157 (1981) (noting court was not called to decide which policy was “better,” but only if existing method of financing public education met state constitutional requirements); Columbia Falls Elementary Sch. Dist. No. 6 v. State, 326 Mont. 304, 109 P.3d 257, 261 (2005) (“As the final guardian and protector of the right to education, it is incumbent upon the court to assure that the system enacted by the Legislature enforces, protects and fulfills the right.”); Leandro v. State, 346 N.C. 336, 488 S.E.2d 249, 253 (1997) (“When a government action is challenged as unconstitutional, the courts have a duty to determine whether that action exceeds constitutional limits.”). A minority of state courts, however, view education clause and equal protection clause challenges as raising political questions.[45]
3. Analysis of education clauses in state constitutions. As indicated above, nearly all of the state constitutions contain provisions related to education. The clauses come in a number of shapes and sizes that have been categorized by commentators. Some of the clauses are characterized as “weak,” while others are thought to be more robust.[46]
A significant number of constitutions that require the legislature to provide for a “thorough and efficient,” “liberal,” “general and uniform,” “general, suitable, and efficient,” “a system of free common schools,” or an “efficient” system of schools, have been held to provide the basis for a judicially enforceable mandatory obligation to provide children with a certain level or quality of education.[47] One *76 court, however, has found that a requirement that “there shall always be free public elementary and secondary schools” is sufficient to establish a minimum qualitative requirement. See Rett, 990 A.2d at 227, 281-82.
On the other hand, there are cases declining to find an enforceable mandatory duty to provide an adequate education based on constitutional provisions that provide for “a system of common schools,”[48] a requirement that schools be “thorough and uniform,”[49] a requirement to make “adequate provision ... for a uniform system of free public schools,”[50] a provision establishing a “a primary obligation” for “the provision of an adequate education,”[51] a provision requiring the state to “establish and maintain a ... thorough system of public, free common schools,”[52] and a provision requiring a “general and uniform system of Common Schools.”[53]
4. Overview of state education cases considering challenges based on substantive due process. At least one court has considered challenges to state educational frameworks based on substantive due process under state constitutions. In Alabama, for instance, the Alabama Supreme Court has adopted a more rigorous standard of substantive due process than employed by the United States Supreme Court. See Mount Royal Towers, Inc. v. Ala. State Bd. of Health, 388 So.2d 1209, 1213-15 (Ala.1980). In the lower court opinion attached as an appendix in Opinion of the Justices, 624 So.2d 107 (Ala.1993), the Alabama circuit court declared that “it is well-settled in this state that when the state deprives citizens of liberty for the purposes of benefiting them with a service, due process requires that the service be provided to them in an adequate form.” Op. of the Justices, 624 So.2d at 161. This approach, however, was later overruled by the Alabama Supreme Court in Ex parte James, 836 So.2d 813, 819 (Ala.2002).
5. Issues arising in state education cases based on state equal protection clauses. In state education cases arising under state privileges and immunities or state equal protection challenges, several issues repetitively appear in the cases. They include the standard of review, whether a party attacking an education scheme must show intentional discrimination, and whether the plaintiffs have identified a class sufficient to support an equal protection claim.
A critical issue is the standard of review. A significant number of state supreme court cases have found that education gives rise to a fundamental interest under state constitutions. These cases reach this result in a number of ways. Some of them explicitly adopt the fundamental interest framework advanced in San Antonio and find that because edu *77 cation is expressly or impliedly rooted in their state constitutions, it arises to a fundamental interest for equal protection purposes. See Washakie Cnty. Sch. Dist. No. One v. Herschler, 606 P.2d 810, 333 (Wyo.1980). Others depart from the San Antonio framework and either apply a more generous test, finding a fundamental interest based on the underlying importance of education generally,[54] or a narrower test than in San Antonio in order to avoid a finding of fundamental interest.[55]
In contrast to these cases, some state supreme courts have followed San Antonio and applied a rational basis standard to education challenges. In most of these cases, the state frameworks have been upheld.[56] But not in every case. In several cases, state supreme courts have applied a rational basis “with teeth” test and have invalidated state education structures on that basis.[57]
A second issue is whether the plaintiff has the burden of showing disparate treatment. With respect to disparate treatment, the state courts that address the issue generally build on the dissent in San Antonio, which notes that the class consists of persons residing in low property tax jurisdictions who are treated differently than those in tax rich geographic locations. See San Antonio, 411 U.S. at 69-70, 93 S.Ct. at 1315, 36 L.Ed.2d at 64 (White, J., dissenting); Serrano I, 96 Cal.Rptr. 601, 487 P.2d at 1261 (state’s general freedom to discriminate based on geographical basis will be significantly curtailed by the Equal Protection Clause); Tenn. Small Sch. Sys. v. McWherter, 851 S.W.2d 139, 154 (Tenn.1993) (citing substantial disparity based on school districts).
A final issue frequently arising in equal protection analysis is the power of the state’s asserted interest in local control in the education arena. As noted in Serrano I and subsequent cases, local control is a “cruel illusion” if disparities are' imposed on poor districts due to the limitations placed on them by the system itself. Serrano I, 96 CahRptr. 601, 487 P.2d at 1260; see also DuPree v. Alma Sch. Dist. No. 30, 279 Ark. 340, 651 S.W.2d 90, 93 (1983). If there are disparities in educational opportunity, a factual question arises: Are the disparities due to local decisions, or are they caused by the state system of financing and providing of education? See Roosevelt Elementary Sch. Dist. No. 66 v. Bishop, 179 Ariz. 233, 877 P.2d 806, 815 (1994) (holding question of whether disparities caused by local decision making or by public school system raises factual question for trial court).
6. Issues related to the type and scope of relief. A critical issue in education cases is the type of relief sought by the plaintiffs. Some plaintiffs seek what some commentators have identified as parity in educational opportunity.[58] Others seek only an “adequate” or a “sound, basic” education. The choice of relief can have dramatic implications for the litigation.
*78 Plaintiffs who seek parity do not require precisely the same educational opportunities, but substantially the same opportunities, as others. The strength of parity theory is that it is perfectly understandable and judicially manageable, namely, that the educational program in school districts needs to be substantially the same. The problems, however, are multiple. Parity theory often requires that the state abandon traditional reliance on local property taxes to fund education. Plaintiffs seeking parity thus raise a specter of “Robin Hood” remedies whereby wealthier school districts are required to transfer educational funds to poorer districts, with the result that the quality of education in more fortunate school districts suffers.
In part because of the difficulties of parity theory, plaintiffs have developed an alternate theory that does not seek parity but instead adequacy. The advantage of adequacy theory is obvious: it does not require that any wealthy school district transfer funds or sacrifice its program, but merely requires the state to ensure that it provides an adequate education to all students. The adequacy approach does not require the complete abandonment of local property taxes.
■ The major challenge with adequacy theory is the development of a proper standard. For example, in Abbeville County School District v. State, 335 S.C. 58, 515 S.E.2d 535, 540 (1999), the South Carolina Supreme Court found a right to a “minimally adequate education.” According to the South Carolina Supreme Court, a minimally adequate education included:
1) the ability to read, write, and speak the English language, and knowledge of mathematics and physical science;
2) a fundamental knowledge of economic, social, and political systems, and of history and governmental processes; and
3) academic and vocational skills.
Abbeville Cnty. Sch. Dist., 515 S.E.2d at 540.
The Kentucky Supreme Court in Rose developed a more detailed seven-factor test. The Kentucky Supreme Court has stated that in order to provide an adequate education, the state must establish a system of education with the ultimate goal of providing to each and every child seven capabilities:
(i) sufficient oral and written communication skills to enable students to function in a complex and rapidly changing civilization; (ii) sufficient knowledge of economic, social, and political systems to enable the student to make informed choices; (iii) sufficient understanding of governmental processes to enable the student to understand the issues that affect his or her community, state, and nation; (iv) sufficient self-knowledge and knowledge of his or her mental and physical wellness; (v) sufficient grounding in the arts to enable each student to appreciate his or her cultural and historical heritage; (vi) sufficient training or preparation for advanced training in either academic or vocational fields so as to enable each child to choose and pursue life work intelligently; and (vii) sufficient levels of academic or vocational skills to enable public school students to compete favorably with their counterparts in surrounding states, in academics or in the job market.
Rose, 790 S.W.2d at 212; Leandro, 488 S.E.2d at 255 (adopting an adaptation of the Rose standards); see also Campaign for Fiscal Equity, Inc. v. State, 100 N.Y.2d 893, 769 N.Y.S.2d 106, 801 N.E.2d 326, 330 (2003) (adopting standard of adequacy).
A third approach to adequacy was taken by the Arkansas Supreme Court in Lake View School District No. 25 v. Huckabee, 351 Ark. 31, 91 S.W.3d 472 (2002). In Lake View, the Arkansas Supreme Court *79 declared in order to provide an “adequate” education, the state must provide standards, develop a system to determine whether the goals are being met, and establish a system of accountability to determine whether funds that are being spent are providing educational opportunity. Lake View, 91 S.W.3d at 500.
In addition to type of relief, a second issue arises regarding the scope of relief. Many courts in the first instance after finding constitutional violations merely provide declaratory relief and exercise continuing jurisdiction to review legislative responses to court rulings. For example, in Lake View, the court stressed that it had no intention “to monitor or superintend the public schools of this state.” Id. at 511. The court instead affirmed a lower court order granting declaratory relief and indicated that it would not hesitate to review the state’s school funding system once again in an appropriate case. Id.; see also Horton v. Meskill, 172 Conn. 615, 376 A.2d 359, 375 (1977) (noting that while it is emphatically the duty of the court to declare what the law is, remedies could be limited to declaratory relief out of respect for other branches of government); Rose, 790 S.W.2d at 214 (declining to direct specific action); Campaign for Fiscal Equity, Inc., 769 N.Y.S.2d 106, 801 N.E.2d at 344-45 (discussing dialogue with legislature). Initially, at least, the remedies of these courts do not intrude deeply on the legislative process other than to declare legal requirement. Over time, however, courts have become more involved in crafting specific legislative remedies in the face of legislative inaction or intransigence. See, e.g., Abbott ex rel. Abbott v. Burke, 199 N.J. 140, 971 A.2d 989, 994-96 (2009).
VI. Application of State Constitutional Principles in Iowa.
A. Threshold Question. The district court determined that the issues raised in this case were nonjusticiable political questions. I disagree. We are called upon, in this case, to decide what the law means. This is the heart of judicial review. We are not called upon to exercise the authority expressly delegated to another branch of government. See, e.g., Rell, 990 A.2d at 217-25. We are called upon to do our job. See Martin H. Redish, Judicial Review and the “Political Question,” 79 Nw. U.L.Rev. 1031, 1059-60 (1984); see generally Louis Henkin, Is There a “Political Question” Doctrine?, 85 Yale L.J. 597 (1976). Notwithstanding some contrary dicta dusted about in Justice Mansfield’s opinion, there is clearly no “political question” posed in this case.
B. State Education Clause. The Iowa education clause is categorized by some scholars as a fairly strong education clause.[59] Regardless of this characterization, it seems clear that education in Iowa is a highly valued constitutional interest. Iowa would not have gained admission to the Union as a state without an education clause. An article of the 1857 constitution was devoted exclusively to education. A-though the Iowa Constitution authorized *80 the general assembly to repeal provisions vesting authority over school matters in a board of education, this constitutional option related solely to the manner in which the state’s constitutional interest in education would be implemented. The Iowa Constitution, read in context, requires a system of “Common schools throughout the State.” See Iowa Const, art. IX, div. 2, § 8. We said as much in Clark, where we emphasized that the State had an obligation under article IX, division 1, section 12 to provide “for the education of all the youths of the State, through a system of common schools.” Clark, 24 Iowa at 274 (quoting Iowa Const, art. IX, div. 1; § 12).
Our constitutional provisions without question are as strong as others in which a constitutional right to an adequate education has been found. See, e.g., Rell, 990 A.2d at 210-12 (simply stating there shall be “free public elementary and secondary schools” in the state); McDuffy, 615 N.E.2d at 517, 526 (stating that it shall be the duty of legislators “to cherish” public schools and grammar schools); Campaign for Fiscal Equity, Inc., 769 N.Y.S.2d 106, 801 N.E.2d at 328 (“a system of free common schools”). The strong emphasis on education in the text (establishing “Common schools throughout the State”) and in our state government tradition cannot be doubted. For these reasons, the State at oral argument conceded that it could not constitutionally refuse to provide public education to children and youth.
The State’s concession was not a blunder but the product of inescapable logic and a desire to avoid looking foolish. The Iowa constitutional provisions in article IX cannot be read to suggest that the legislature has the discretion to withdraw from public education and close the public schools. But, if there is a requirement that the State provide a public education for children and youth through “Common schools throughout the State,” it certainly must be implied that the education provided in the common schools must be a meaningful education and not just some empty formalism. There must be some substance to the mandatory duty, some concrete reality, some meat on the bones. Just as the “right to counsel” under the Federal and State Constitutions means the right to “effective” assistance of counsel, McMann v. Richardson, 397 U.S. 759, 771 & n. 14, 90 S.Ct. 1441, 1449 & n. 14, 25 L.Ed.2d 763, 773 & n. 14 (1970), the duty of the state to provide common schools throughout the state requires that the education in the schools meet minimum standards of adequacy.
Nothing in Kleen v. Porter, 237 Iowa 1160, 23 N.W.2d 904 (1946), is to the contrary. Kleen involved a question of providing additional funds for public schools, but did not address in any way the duty of the state to maintain common schools throughout the state. Kleen, 237 Iowa at 1167-69, 23 N.W.2d at 908-09. In fact, by citing article IX, division 1, section 12, Kleen supports the view of an ongoing obligation to provide a system of common schools to all youth. See id. at 1162, 23 N.W.2d at 905.
Further, while Justice Mansfield’s opinion makes much of the fact that the framers did not include the word “free” in the education clause, this is hardly dispositive of whether there is a mandatory duty to make meaningful public education available in the common schools to everyone who desires an education. Charges that prevented a person from obtaining a public education in common schools would surely go the way of the poll tax. See Harper, 383 U.S. at 666-68, 86 S.Ct. at 1081-82, 16 L.Ed.2d at 172-73.
Justice Mansfield’s opinion states that because the plaintiffs did not cite article IX, division 1, section 12 of the Iowa Constitution in their trial brief, it can ignore *81 the provision by regarding the argument as waived. Article IX, division 2, section 8, however, cannot be torn away from the previous constitutional provision. To begin with, the language of article IX, division 2, section 8 requiring the legislature to “encourage, by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvement” in my view incorporates within its scope the obligation to establish “a system of Common Schools” as required by article IX, division 1, section 12. My incorporation theory is strongly supported by reference in article IX, division 2, section 3 to a perpetual fund for “Common schools throughout the State,” namely, the “system of Common Schools” referred to in article IX, division 1, section 12. In my view, Justice Mansfield’s opinion seeks to separate the twins that were joined at birth in a way that elevates form over substance. See Office of Consumer Advocate v. Iowa State Commerce Comm’n, 465 N.W.2d 280, 283-84 (Iowa 1991) (holding error is preserved under Due Process Clause even though the party merely cited to the Fourteenth Amendment, stating to rule otherwise would “elevate[] form over substance”). In addition, it is difficult to understand how Justice Mansfield’s opinion finds that the education, due process, and privileges and immunities issues, though not briefed on appeal, are properly before the court as “interrelated” with the issue of justiciability, while the substantive obligations of article IX, division 1, section 12 and article IX, division 2, section 3 are not.
In any event, there is no question that the issue of whether education is a fundamental interest under the privileges and immunities clause of the Iowa Constitution was preserved in the trial court, and according to Justice Mansfield’s opinion, may be considered on appeal even though the matter has not been briefed before this court. Therefore, even assuming the claim under article IX, division 1, section 12 is “waived,” the issue of applicability of the privileges and immunities clause remains very much alive under the issue preservation reasoning of Justice Mansfield’s opinion. Any right to an education under article IX is coextensive to the fundamental right to an education under the privileges and immunities clause, the only difference being the right to an education under article IX does not require a classification.
C. Privileges and Immunities Clause. The first issue for consideration under Iowa’s privileges and immunities clause is whether education may be characterized as a fundamental interest under the traditional framework. If one utilizes the test enunciated in San Antonio, the answer is plainly yes. According to San Antonio, a fundamental .interest is present when an interest is explicitly of implicitly protected by constitutional provisions. See San Antonio, 411 U.S. at 33, 93 S.Ct. at 1297, 36 L.Ed.2d at 43. Plainly, the Iowa education articles meet the test. Further, under San Antonio, the question of whether there is a fundamental interest in a minimally adequate education was expressly reserved. Id. at 36-37, 93 S.Ct. at 1298-99, 36 L.Ed.2d at 44-45. Thus, even applying the federal constitutional test, a student’s interest in an adequate education would be a fundamental interest under the Iowa Constitution in light of the explicit provisions for education.
Further, aside from the San Antonio test, I conclude education is a fundamental interest under other tests fashioned by state supreme courts. The express Iowa constitutional provisions; the centrality of education to our state’s history; the strong and unqualified traditional support for education of Iowa’s political leaders; the inextricable relationship between education and other key constitutional rights, namely, the right to vote, the right to serve on juries, the right to petition gov *82 ernment, and the undeniable proposition that an individual has little prospect of enjoying life, liberty, and property without an education in the postmodern world; and the centrality of education to human dignity; all convince me that education must be considered a fundamental interest under Iowa’s privileges and immunities clause. See Serrano I, 96 Cal.Rptr. 601, 487 P.2d at 1255-59; Robinson v. Cahill, 69 N.J. 183, 351 A.2d 713, 720 (1975). To characterize the interest in education as something other than fundamental seems like a play on words.[60] I would thus join the supreme courts of Arkansas, California, Connecticut, Kentucky, Minnesota, New Jersey, Tennessee, Washington, West Virginia, Virginia, and Wisconsin in finding that education is an interest that may trigger heightened scrutiny under state privileges and immunities or equal protection clauses.[61]
In fact, the motivating reasons for not finding education “fundamental” has nothing to do with its importance or essential character. Instead, courts are sometimes reluctant to characterize education as “fundamental” because they fear the consequences of strict scrutiny, which has been described as strict in theory but fatal in fact. See, e.g., McDaniel, 285 S.E.2d at 167 (citing need to avoid inflexible constitutional restraints that result from strict scrutiny); Norman Dorsen, Equal Protection of the Laws, 74 Colum. L.Rev. 357, 362 (1974) (noting that the “sharp dichotomy between the rational basis and strict scrutiny tests produces back-door evasions of the two-tiered formula”); Gerald Gunther, Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv. L.Rev. 1, 8 (1972) [hereinafter Gunther] (first suggesting strict in theory, fatal in fact formulation); Martha M. McCarthy, Is The Equal Protection Clause Still A Viable Tool for Effecting Educational Reform?, 6 J.L. & Educ. 159, 178 (1977) (noting rigor of strict scrutiny test has caused courts to limit rights identified as suspect or fundamental so as not to unduly invade legislative power). The fatal-in-fact feature of strict scrutiny is thought to be inappropriate in situations involving complex-matters such as education.
I find merit in the argument that strict scrutiny as traditionally applied by the United States Supreme Court and by this court should not be used to evaluate all educational differences between school districts. For instance, a marginal or insubstantial difference between school districts — such as the failure to offer a handful of noncore courses, or the lack of certain helpful but hardly essential extracurricular activities — should not trigger a strict scrutiny analysis. This concern over the consequences of strict scrutiny, however, can be addressed by limiting heightened review only to asserted violations of a right to an adequate or basic education.
*83 The concept of heightened protection for an adequate or basic education but not for all educational differences has support in the caselaw of other states. For example, both the Minnesota and Wisconsin Supreme Courts have adopted such an approach in their efforts to sort through the constitutional issues related to education. See Skeen v. State, 505 N.W.2d 299, 315 (Minn.1993); Kukor v. Grover, 148 Wis.2d 469, 436 N.W.2d 568, 579 (1989).
By limiting heightened scrutiny to the deprivation of an adequate or basic education and by employing a lesser degree of scrutiny to legislative classifications that do not impinge on an adequate education, state officials would have ample breathing room for their important policy-making role, yet still require that the state provide all students with a meaningful educational opportunity.
The next question which arises is the content of a basic or adequate education that triggers heightened scrutiny. Based on the reasoning of the adequacy cases cited above, I conclude that a basic or adequate education must be sufficient to allow a person to participate meaningfully in democracy through the right to vote, the right to petition government, and jury duty, and to have meaningful prospects of enjoying “life, liberty, and property.” In order to achieve these ends, education must be sufficient to allow an individual a meaningful opportunity to participate in economic life in the postmodern world. See Campaign for Fiscal Equity, Inc., 769 N.Y.S.2d 106, 801 N.E.2d at 330-32; Hoke Cnty. Bd. of Educ. v. State, 358 N.C. 605, 599 S.E.2d 365, 379-81 (2004); Abbeville Cnty. Sch. Dist., 515 S.E.2d at 540; Rose, 790 S.W.2d at 211-13. In order to satisfy these demands, I would adopt a variant of the factors in Rose and other adequacy cases: An educational program must, among other things, include effectively teaching the ability to read and write, to communicate effectively, to perform in mathematical computations, to have exposure to scientific principles, to have a basic understanding of economics and government, and to learn how to use computer-based technology that is so indispensible in the postmodern world. An education program need not guarantee results to meet the constitutional test, but it must provide a meaningful educational opportunity to participate in the political, social, and economic life.
I 'would not, however, adopt the approach of the Arkansas Supreme Court in Lake View. While the adoption of standards, systems of monitoring, and systems of accountability might help ensure compliance with the substantive constitutional requirements outlined in this opinion, I would not mandate the precise manner in which the State performs its constitutional obligation. I would decline to enter the fray of educational philosophy other than as required to ensure that children have a reasonable opportunity to a basic education and that all other material differences in educational opportunity be justified by a rational basis as described below.
The defense to privileges-and-immunities-type claims is, of course, invariably “local control.” But local control is not an automatic trump card that applies as a matter of law in all cases involving educational interests as Justice Mansfield’s opinion seems to believe. Instead, whether “local control” will be sufficient to carry the day will depend upon a number of determinations. First, the court must determine, as a matter of fact, whether the alleged shortcomings in education are present. Second, the court must determine if the plaintiff can prove that state action has caused the deprivations. Third, assuming that deprivations are present and they are caused by the state, the question arises whether the deprivation is sufficient to undermine the right to an *84 adequate or basic education. If the shortcomings deprive the plaintiffs of a basic education, then heightened scrutiny will apply to the classification. To the extent “local control” is asserted as the legitimate basis for a classification, the decision to provide different services must be a discretionary choice of local administrators and not the result of state law or legal structure that forces local decision makers into Hobson’s choices. See Tenn. Small School Sys., 851 S.W.2d at 154-55 (the issue is not whether local control is a good thing, but whether the statutory framework actually promotes it or undercuts it). Local control, however, must not be a “euphemism masking gross inequalities in the abilities of school districts to meet their needs.” Lujan v. Colo. State Bd. of Educ., 649 P.2d 1005, 1040 (Colo.1982) (Lohr, J., dissenting).[62]
My approach to Iowa’s privileges and immunities clause is not necessarily a departure from federal precedent. As noted in San Antonio and Papasan, the question of whether there is a fundamental right to a minimally adequate education is still open under the Federal Equal Protection Clause. See Papasan v. Attain, 478 U.S. 265, 285, 106 S.Ct. 2982, 2944, 92 L.Ed.2d 209, 282 (1986); San Antonio, 411 U.S. at 36-37, 93 S.Ct. at 1298-99, 36 L.Ed.2d at 44-45. Moreover, applying the San Antonio test of what amounts to a fundamental interest (explicit or implicit protection in the constitution itself), my conclusion seems inescapable. In any event, even if my approach affords greater protection to education under our privileges and immunities clause than is available under the Federal Equal Protection Clause, this is not unusual. State courts in at least twenty-one states have interpreted their equality clauses more expansively than the United States Supreme Court’s interpretation of equal protection. See Jeffrey M. Shaman, The Evolution of Equality in State Constitutional Law, 34 Rutgers L.J. 1013, 1031 (2003).
To the extent plaintiffs show a classification affecting education that does not impinge upon their fundamental right to an adequate education, I conclude that a type of rational basis test should apply. A simple declaration that such nonfundamental classifications are subject to rational basis review is not the end of the matter. As has been repeatedly and widely recognized, there are many variations and permutations of the rational basis test.[63]
*85 For example, the United States Supreme Court has clearly applied a number of materially different rational basis tests. A first type of rational basis test employed by the Supreme Court is the one utilized by Justice Mansfield’s opinion, where a statute is examined to determine if there is “any conceivable basis” to support it. The Supreme Court also sometimes engages in what has been called “a second order” rational basis review where there is inquiry into whether, as a matter of fact, the claimed purposes of the statute have adequate factual support. See Romer v. Evans, 517 U.S. 620, 626-35, 116 S.Ct. 1620, 1624-28, 134 L.Ed.2d 855, 862-68 (1996) (applying more substantial rational basis test in invalidating Colorado constitutional amendment to prohibit government from enacting antidiscrimination ordinances by calling asserted purposes “implausible”); City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 448, 105 S.Ct. 3249, 3258, 87 L.Ed.2d 313, 325 (1985) (citing lack of evidence in “the record” to justify denying occupants use of site); U.S. Dep’t of Agric, v. Moreno, 413 U.S. 528, 535-36, 93 S.Ct. 2821, 2826, 37 L.Ed.2d 782, 788-89 (1973) (invalidating antifraud regulation excluding households with unrelated individuals from receiving food stamps based on “unsubstantiated” assumptions); Robert C. Farrell, Successful Rational Basis Claims in the Supreme Court from the 1971 Term Through Romer v. Evans, 32 Ind. L.Rev. 357, 358 (1999) (identifying two sets of rationality cases decided by United States Supreme Court with no connection between them); Robert C. Farrell, The Two Versions of Rational-Basis Review and Same-Sex Relationships, 86 Wash. L.Rev. 281, 282 (2011) (characterizing Supreme Court rational basis review cases as Jekyll and Hyde- or Janus-like); R. Randall Kel-so, Sta/ndards of Review Under the Equal Protection Clause and Related Constitutional Doctrines Protecting Individual Rights: The “Base Plus Six” Model and Modem Supreme Court Practice, 4 U. Pa. J. Const. L. 225, 227-37 (2002) (describing three types of rational basis tests).
There have long been calls for the United States Supreme Court to abandon its approach to “any conceivable basis” rational basis scrutiny. In a seminal law review article published in 1972, Gerald Gunther urged the Court to develop a more meaningful approach to equal protection that included more stringent rational basis review. See Gunther, 86 Harv. L.Rev. at 20-24. In a series of opinions, Justice Marshall and Justice Stevens have pointed out the inconsistencies in the Court’s cases and advocated an honest reevaluation of the doctrine. See City of Cleburne, 473 U.S. at 451-55, 105 S.Ct. at 3260-63, 87 L.Ed.2d at 327-30 (1985) (Stevens, J., concurring); Mass. Bd. of Ret. v. Murgia, 427 U.S. 307, 321-22, 96 S.Ct. 2562, 2571-72, 49 L.Ed.2d 520, 529-30 (1976) (Marshall, J., dissenting). So far, the United States Supreme Court has not explicitly resolved the tensions in its cases.
*86 Aside from inconsistency, there is another reason for state supreme courts to depart from federal precedent when analyzing equal protection-type claims. A major factor in the highly deferential rational basis standard developed by the United States Supreme Court is the desire to honor federalism and to avoid imposing national solutions onto the states. Justice Harlan warned long ago that national application of federal standards to the states in order to give the states elbow room in their criminal processes would lead to a dilution of substantive constitutional protections. Baldwin v. New York, 899 U.S. 117, 118, 90 S.Ct. 1914, 1915, 26 L.Ed.2d 446, 447 (1970) (Harlan, J., concurring in part and dissenting in part). Indeed, federalism constraints were a motivating factor in the Supreme Court’s refusal to .impose strict scrutiny in San Antonio. Because of the federalism concerns, the Federal Equal Protection Clause tends to be among the most underenforced of constitutional provisions. See Hershkoff, 112 Harv. L.Rev. at 1134-38; Lawrence Gene Sager, Fair Measure: The Legal Status of Underen-forced Constitutional Norms, 91 Harv. L.Rev. 1212, 1218 (1978). The federalism concern, of course, is wholly absent when state courts consider claims under the state constitutions.
As a result, it is not surprising that a number of state supreme courts have declined to follow the federal model and have developed their own approach to equal protection or privileges and immunities review.[64] Many of the more than a dozen states that have privileges and immunities type language rely to some extent on the tiered federal model, but there are many variations. Several states have rejected the “any conceivable basis” rationality standard for more exacting judicial review of some legislative classifications. See, e.g., Trujillo v. City of Albuquerque, 125 N.M. 721, 965 P.2d 305, 314 (1998); MacCallum v. Seymour, 165 Vt. 452, 686 A.2d 935, 938-39 (1996). Other states, for instance, have adopted a unitary test that balances the nature of the right, the extent to which the government intrudes upon the right, and the need for the restriction. See, e.g., Dep’t of Revenue v. Cosio, 858 P.2d 621, 629 (Alaska 1993); Planned Parenthood of Cent. N.J. v. Farmer, 165 N.J. 609, 762 A.2d 620, 632-43 (2000). Other states have adopted a system of means-focused scrutiny that appears more intensive than the most lenient standard sometimes applied by the United States Supreme Court. See, e.g., State v. Mowrey, 134 Idaho 751, 9 P.3d 1217, 1221 (2000).
The variability in “rational basis” tests is demonstrated in the state education cases. Some courts, like Indiana, have declared over a strong dissent that, as a matter of law, local control is an adequate rational basis to justify a state framework for providing education. Other states, however, like Arkansas, have found after the development of substantial factual records that their system of state funding fails to meet even the rational basis test. See, e.g., DuPree, 651 S.W.2d at 95.
There is much to be said for a more searching rational basis review. The “any conceivable basis” test tends to be no review at all. The cases show some striking examples, like Louisiana legislation where only licensed florists may arrange flowers, defended as a health measure, and an *87 Oklahoma statute preventing anyone other than a person with a license in mortuary science from selling caskets. See Clark Neily, No Such Thing: Litigating Under the Rational Basis Test, 1 N.Y.U. J.L. & Liberty 898, 906 (2005).
The suggestion that the incantation of the phrase “local control” is sufficient to decide this case at this stage as a matter of law cannot stand scrutiny. When an allegation of a violation of our privileges and immunities clause in the field of education is alleged, we should turn a cocked ear, not a blind eye. When local control is asserted as a justification for differences in educational quality, we should consider whether local educational leaders are, in fact, making local choices entitled to deference, or whether they are forced into Hobson’s choices because of an educational structure that prevénts them from delivering a quality education. The concept was well expressed by one observer, who noted that “[everywhere, local autonomy is compromised by centralized authority.... Practically, the rhetoric of local autonomy is difficult to take seriously given overwhelming evidence of the fiscal, political, and judicial domination of local governments by higher tiers of the state.” Gordon L. Clark, Judges and the Cities: Interpreting Local Autonomy 113-14 (1985) (citation omitted). In other words, the question we should ask is this: Is local control really at work, or is it a euphemism masking inequalities in the ability of school districts to provide educational opportunities to its students? See Lujan, 649 P.2d at 1040 (Lohr, J., dissenting).
Justice Mansfield’s opinion employs the label “local control” without analysis of exactly what that means. In San Antonio, local control was favored because it encouraged citizen participation in decision making, permitted the structuring of school programs to fit local needs, and encouraged “experimentation, innovation, and a healthy competition for educational excellence.” San Antonio, 411 U.S. at 50, 93 S.Ct. at 1305, 36 L.Ed.2d at 52-53. Should we declare, as a matter of law, that the distinctions between the various school districts in this case were the result of these factors? Is it not possible that, in this case, the state regulatory framework in actuality deprives local school boards of local control in the sense that they do not have the practical ability to make considered policy choices? Would the responsible school officials in the districts where the plaintiffs reside claim that the alleged dramatic differences in teacher experience, course loads per teacher, and curriculum offerings were the result of a local, discretionary choice or would they cite systemic limitations? Does the way education is structured in Iowa promote local control or restrict it? We will, of course, never know the answer to these questions in light of the summary dismissal of the case without the development of a factual record.
In RACI, we conducted a meaningful rational basis review. Fitzgerald, 675 N.W.2d at 7-8. We were not content to rest solely on the pleadings, but conducted a factual inquiry to see whether the purported justifications, while conceivable, were in fact sufficient to support a statutory distinction. Specifically, we noted that the conceivable state interest must have “a basis in fact.” Id.
In my view, we should apply a meaningful rational basis test in this case with respect to classifications which adversely affect the plaintiffs but do not arise to deprivations of an adequate education. It allows substantial deference to decisions of other branches of government, but imposes a reality check to prevent arbitrary and irrational distinctions from creeping into educational structures in the name of “local control.”[65]
*88 D. Due Process Clause. I have no doubt that there is a potential due process claim in light of the compulsory nature of school attending. We said as much in Extra. The notion is uncontroversial that where a liberty interest is impaired — and surely it is impaired by mandatory school attendance — the deprivation of liberty must be rationally related to a legitimate state objective. Youngberg, 457 U.S. at 324, 102 S.Ct. at 2462, 73 L.Ed.2d at 42-43. There is also no doubt that education is a legitimate state objective. The question under due process is whether the education received by the person whose liberty is impaired is rationally related to the state’s legitimate interest in educating citizens. Any application of the due process clause, however, would give the state a wide range of permissible action in providing education to its charges. There is no due process right to a specific kind of education, but only a sufficiently reasonable educational effort to justify the intrusion on the liberty interest.
E. Application of Law to Facts Alleged in the Petition. Having established the necessary legal framework, the question remains whether the petition alleges sufficient facts to survive a motion to dismiss. Our pleading caselaw requires a general notice of the nature of the claim, but does not require pleading of detailed facts. Davis v. Ottumwa YMCA, 438 N.W.2d 10, 13 (Iowa 1989). We have stated that pleading is sufficient if it apprises the opposing party of the nature of the incident out of which the claim arose and the general nature of the action. Haugland, v. Schmidt, 349 N.W.2d 121, 123 (Iowa 1984). We have stated that “[i]n Iowa, very little is required by way of pleading to provide notice.” Wither v. Wither, 630 N.W.2d 590, 595 (Iowa 2001). Notice pleading in Iowa does not require pleading of ultimate facts that support the elements of the cause of action but only facts sufficient to apprise the defendant of fair notice of the claim. Schmidt v. Wilkinson, 340 N.W.2d 282, 283-84 (Iowa 1983).
Our principles of pleading were well stated in U.S. Bank v. Barbour, 770 N.W.2d 350, 353-54 (Iowa 2009), in which we stated that “[njearly every case will survive a motion to dismiss” and that the “fair notice” requirement is met if the petition “informs the defendant of the incident giving rise to the claim and of the claim’s general nature.” We recently affirmed our approach in Hawkeye Foodservice Distribution, Inc. v. Iowa Educators Corp., 812 N.W.2d 600, 609 (Iowa 2012), in which we rejected an effort to institute a heightened pleading requirement sometimes used by the United States Supreme Court, see, e.g., Ashcroft v. Iqbal, 556 U.S. 662, 678-79, 129 S.Ct. 1937, 1949-50, 173 L.Ed.2d 868, 883-84 (2009), and Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 1973-74, 167 L.Ed.2d 929, 949 (2007), and reaffirmed our traditional generous pleading approach.
*89 I conclude that the plaintiffs’ claim should not be dismissed at this stage. The plaintiffs claim they are being deprived of an “effective education” and an “adequate education.” They claim their education is so deficient that students “are not prepared to enter the workforce or post-secondary education” and are not “prepared for responsible citizenship, further learning and productive employment in a global economy.” They have also pled differences in the quality of education in their school districts in terms of teacher experience, course loads, and course offerings. In light of our pleading rules, which have been held to provide that “very little is required by way of pleading to provide notice,” these allegations are sufficient to raise a claim of adequacy that cannot be precluded as a matter of law at this stage of the proceedings. See Wilker, 630 N.W.2d at 595; Herschler, 606 P.2d at 316 (attack on “system” is sufficient to survive motion to dismiss); see also Lujan, 649 P.2d at 1010 (appellees did not plead or prove denial of educational opportunity); Hombeck v. Somerset Cnty. Bd. of Educ., 295 Md. 597, 458 A.2d 758, 780 (1983) (no allegation of deprivation of a right to adequate education).
In any event, there is no question that the plaintiffs state a claim reviewable under a rational basis test, which in my view requires factual development of the relationship between the purported purposes of the policies that cause the differences between school districts and whether the means chosen rationally advance them. Preexisting commitment to the ideology of “Our Localism” does not form a legally sufficient basis for rejecting a more nuanced inquiry when an interest as important as education is involved.[66]
It may well be, of course, that the plaintiffs may fail, in whole or in part, to prove their case. But they are entitled to attempt to prove it. A motion to dismiss is not a vehicle to dismiss claims that some on an appellate court may perceive as weak. The only issue when considering a motion to dismiss is the “petitioner’s right of access to the district court, not the merits of his allegations.” Rieff v. Evans, 630 N.W.2d 278, 284 (Iowa 2001) (citation and internal quotation marks omitted). The approach taken in Justice Mansfield’s opinion to the pleading in this case is a marked departure from our pleading requirements generally and has no prece-dential value except to dispose of this case.
F. Remedies. It is sometimes suggested that remedial difficulties require the judiciary to abandon the field of enforcing state constitutional commands related to education. Ordinarily, respect for the coordinate branches of government requires a court not to unduly intrude onto the workings of the other branches. As a result, in a case such as this one, there is little to be gained, and much to be lost, by premature entry of detailed mandatory orders. If a constitutional violation is found, there will be a number of different possibilities that the legislature may wish to consider to solve the problem. As long as the ultimate action complies with the constitutional commands, this court has no interest in invading the discretion of the legislature. As Justice Jackson stated years ago, a holding of invalidity under the Equal Protection Clause “does not disable any governmental body from dealing with the subject at hand.” Ry. Express Agency v. New York, 336 U.S. 106, 112, 69 S.Ct. 463, 466, 93 L.Ed. 533, 540 (1949) (Jackson, J., concurring).
*90 The case against “The Structural Injunction” in the education context was made by Chief Justice Roy Moore, formerly of the Alabama Supreme Court, in Ex parte James. In that case, Chief Justice Moore went to great lengths to undermine the power of judicial review and to suggest that the courts must generally defer to political branches' of government. Ex parte James, 836 So.2d at 856 (Moore, C.J., concurring in the result in part and dissenting in part).
I do not find, however, that problems related to remedies should oust this court’s ability to consider the substantive merits of this ease. Such an approach would establish an unwise precedent. Broadside statements regarding “The Structural Injunction,” for instance, threaten to undermine not only the result in this case, but bedrock cases such as Brown, Gideon v. Wainwnght, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), the courageous holding in Aderholt, and countless less celebrated cases dealing with the nitty gritty of obtaining constitutional compliance with respect to overcrowded prison systems and grossly inadequate mental health facilities. Sweeping declarations regarding remedies also ignore the highly nuanced approaches of many state courts to remedial issues related to the provision of adequate education that emphasize collaboration over confrontation. See, e.g., Rell, 990 A.2d at 221-23 (discussing need for flexible, graduate remedies); Campaign for Fiscal Equity, Inc., 769 N.Y.S.2d 106, 801 N.E.2d at 344-49 (N.Y.2003) (discussing flexible remedies in education context).
While a prudent and respectful approach to potential remedies makes sense, this case should not be a springboard for this court to adopt a radical doctrine that threatens many decades of jurisprudence. A disabling doctrine of sharply curtailed remedies would reduce the guarantees of the State and Federal Constitutions that protect individual liberties and establish affirmative duties to hollow platitudes. This indirect substantive evisceration of our State and Federal Constitutions is a project that may appeal to others, but not to me.
VII. Conclusion.
In my view, regardless of whether the plaintiffs have pled and/or preserved a claim under article IX of the Iowa Constitution or stated a claim under the Due Process Clauses of the Iowa and Federal Constitutions. I believe it is inescapable that education is a fundamental interest under the state constitutional guarantee of equal protection. Because of the sensitive nature of educational decision making, however, I would differentiate between a basic or adequate education and other elements of education that fall outside that category. I would apply heightened scrutiny with respect to claims of deprivation of adequate education and only a rational basis type scrutiny to other claims.
Having determined these legal issues, I would apply our traditionally liberal pleading standards to the plaintiffs’ petition. The petition is not very precise and does not clearly outline what government action is causing what deprivation. Nevertheless, I am not prepared to say at this stage that there is no possibility that the plaintiffs will be able to show an entitlement to relief. Rather than rush to judgment in this case without the development of an adequate factual record, I would deny the motion to dismiss and remand the case to the district court for further proceedings.
HECHT, J., joins this dissent.

. In his inaugural address in 1987, Governor Branstad, in calling for educational reform, stated that "our commitment to education is not new” and cited "our first territorial Governor, Robert Lucas.” 1987 S.J. 94. Governor Branstad further made reference to the state's "historic commitment to education." Id. at 95.

. My citation to the education provisions of the Universal Declaration of Human Rights has drawn criticism today. The criticism might more appropriately be aimed at Eleanor Roosevelt, who chaired the drafting committee that produced the Declaration, or to the members of the United States Senate, which ratified it. I recognize that the Declaration was designed to be nonbinding — indeed, the decision to use the term "Declaration” was modeled on the United States Declaration of Independence. Of course, I do not suggest that the participants in the Iowa constitutional conventions relied on the Declaration, which was approved a hundred years later. I do suggest, however, that the Declaration reinforces the widely accepted view that education is broadly regarded as a basic human right and that it is integrally related to the development of the individual. That point, it seems, has not been assailed.

. In looking at legal questions from a broad perspective for nonbinding but instructive lessons, I am in good company. The leaders of the American Revolution and the founding fathers certainly did. See, e.g., Bernard Bai-lyn, The Ideological Origins of the American Revolution 23-44 (Enlarged ed.1992) (citing extensive use of foreign authorities in publications associated with the American Revolution); James Madison, Notes of the Debates in the Federal Convention of 1787, at 54, 59, 63, 76, 83, 100, 126, 132, 136-37, 141, 143, 145, 161, 205, 207, 214-15, 223, 241, 255-56, 307, 334, 359, 364, 418, 463 (Bicentennial ed., W.W. Norton & Co. 1987) (discussing French judiciary; pluralistic military command in Holland; Roman tribunals; the union of England and Scotland; Dutch seduction into the views of France; lessons of Dutch, Swiss, Helvetic, Germanic, Lycian, and Belgic confederacies; dangers of corruption, as illustrated by leadership in Sweden, France, and England; Polish and German elections; analogy to the law of nations in fashioning relationship between the state and federal governments; experience in Persia, Austria, France, Switzerland, and Russia; commerce involving France, England, and Spain; means of defense against a foreign danger in Rome and Europe as examples of instruments of tyranny; importance of an efficient government, as illustrated by German and Grecian experiences; Polish elections; military cooperation between France and Holland; Athenians and foreign affairs; the Kingdom of France as governing by force; separation of powers and the Ephori at Sparta; structures in preexisting state constitutions; England and Great Britain); see also The Federalist No. 18 (Alexander Hamilton & James Madison) (stating the "Achaean league ... was another society of Grecian republics, which supplies us with valuable instruction”), No. 19 (Alexander Hamilton & James Madison) (referencing the governments of Greece, Sweden, Germany, and the United Netherlands), No. 39 (James Madison) (discussing the characteristics of a republican form of government and comparing the governments of Holland, Venice, Po *61 land, and England), No. 43 (James Madison) (discussing Sparta, Greece, and Crete), No. 52 (James Madison) (referencing Irish elections), No. 75 (Alexander Hamilton) (citing examples of the Roman Tribuneship, the Polish Diet, and the States-General of the Netherlands). In addition, the founders were all familiar with international authorities such as Vattel, Grotius, Montesquieu, Burlamaqui, and Puf-endorf. See generally Donald S. Lutz, The Relative Influence of European Writers on Late Eighteenth-Century American Political Thought, 78 Am. Pol. Sci. Rev. 189, 193-94 (1984).
References to international law and experience have been made by distinguished Justices of the United States Supreme' Court, including, but not limited to, Justices Marshall, Story, Holmes, Frankfurter, Jackson, Rehnquist, Breyer, Ginsberg, and Kennedy. See, e.g., Roper v. Simmons, 543 U.S. 551, 577-78, 125 S.Ct. 1183, 1199-1200, 161 L.Ed.2d 1, 26-27 (2005) (Kennedy, J.); Grutter v. Bollinger, 539 U.S. 306, 344, 123 S.Ct. 2325, 2347, 156 L.Ed.2d 304, 342 (2003) (Ginsburg, J., concurring); Printz v. United States, 521 U.S. 898, 976-77, 117 S.Ct. 2365, 2405, 138 L.Ed.2d 914, 970-71 (1997) (Breyer, J., dissenting); Washington v. Glucksberg, 521 U.S. 702, 718 n. 16, 117 S.Ct. 2258, 2266 n. 16, 138 L.Ed.2d 772, 786 n. 16 (1997) (Rehnquist, C.J.); Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 651-52, 72 S.Ct. 863, 878, 96 L.Ed. 1153, 1207-08 (1952) (Jackson, J., concurring); Rochin v. California, 342 U.S. 165, 170-71 & n. 4, 72 S.Ct. 205, 208-09 & n. 4, 96 L.Ed. 183, 189 & n. 4 (1952) (Frankfurter, J.); Block v. Hirsh, 256 U.S. 135, 155, 158, 41 S.Ct. 458, 459-60, 65 L.Ed. 865, 870, 872 (1921) (Holmes, J.); Brown v. United States, 12 U.S. (8 Cranch) 110, 128-36, 3 L.Ed. 504, 510 (1814) (Marshall, C.J.); Brown, 12 U.S. (8 Cranch) at 131-38, 3 L.Ed. at 511-14 (Story, J., dissenting).
Similarly, state court cases have often cited international norms in a wide variety of cases. See, e.g., Sterling v. Cupp, 290 Or. 611, 625 P.2d 123, 131 & n. 21 (1981) (citing the Universal Declaration of Human Rights in reviewing constitutionality of state law allowing female officers to perform body searches of male inmates); Eggert v. City of Seattle, 81 Wash.2d 840, 505 P.2d 801, 802 (1973) (citing the Universal Declaration of Human Rights in vindicating the right to freedom of movement); Pauley v. Kelly, 162 W.Va. 672, 255 S.E.2d 859, 864 n. 5 (1979) (citing the Universal Declaration of Human Rights in support for state constitutional right to education).
The framers of the Iowa Constitution applied a broad perspective to their task as well, specifically in the field of education. George W. Ells, in debating the importance of education during the 1857 constitutional convention, observed:
[I]n those countries of Europe where education has taken the deepest root, and been the most generally diffused among the masses, that the people are correspondingly steady, firm and abiding in their attachment to free and liberal institutions of all kinds. The Germans are a striking illustration of the truth of this assertion. With them, education is the rule, and ignorance the exception; while with the volatile Frenchman, the reverse is true.
1 Debates at 602. It is not surprising that our caselaw has on occasion cited maxims or norms of international law. See Langlas v. Iowa Life Ins. Co., 245 Iowa 713, 718, 63 N.W.2d 885, 888 (1954) (citing international law treatise in case involving insurance claim arising out of Korean war); Case v. Olson, 234 Iowa 869, 874, 14 N.W.2d 717, 720 (1944) (citing international law of war in case involving application of soldiers' preference clause in civil service statute); Hill v. Baker, 32 Iowa 302, 310 (1871) (execution of deed held invalid as contrary to international law); Morrison v. Springer, 15 Iowa 304, 316 (1863) (citing maxims of international law in jurisdictional matter).
Consistent with the legal traditions exemplified by the framers of both the Iowa and Federal Constitutions, the University of Iowa College of Law has a program in international and comparative law. Its website states that international and comparative law "provides an essential theoretical foundation for all lawyers by affording unique insight into the nature of law and legal process.” See The University of Iowa College of Law, International and Comparative Law Program (last visited April 5, 2012), http://www.law.uiowa.edu/ international/.

. See, e.g., David Schuman, The Right to “Equal Privileges and Immunities”: A State's Version of “Equal Protection,” 13 Vt. L.Rev. 221 (1988) [hereinafter Schuman]; Jeffrey M. Shaman, The Evolution of Equality in State Constitutional Law, 34 Rutgers L.J. 1013 (2003) [hereinafter Shaman]; Jonathan Thompson, The Washington Constitution's Prohibition on Special Privileges and Immunities: Real Bite for "Equal Protection” Review of Regulatory Legislation?, 69 Temp. L.Rev. 1247 (1996); Robert F. Williams, Foreword: The Importance of an Independent State Constitutional Equality Doctrine in School Finance Cases and Beyond, 24 Conn. L.Rev. 675 (1992).

. In Papasan v. Attain, 478 U.S. 265, 285, 106 S.Ct. 2932, 2944, 92 L.Ed.2d 209, 232 (1986), Justice White noted that the issue of whether there was a fundamental right to a minimally adequate education was not definitively resolved in San Antonio. See also Preston C. Green & Bruce D. Baker, Circumventing Rodriguez: Can Plaintiffs Use the Equal Protection Clause to Challenge School Finance Disparities Caused by Inequitable State Distribution Policies?, 7 Tex. F. on C.L. & C.R. 141, 150 (2002) (noting unresolved question of federal law).

.See, e.g., Op. of the Justices, 624 So.2d 107, 112 (Ala.1993); Roosevelt Elementary Sch. Dist. No. 66 v. Bishop, 179 Ariz. 233, 877 P.2d 806, 811-12 (1994); DuPree v. Alma Sch. Dist. No. 30, 279 Ark. 340, 651 S.W.2d 90, 91 (1983); Lujan v. Colo. State Bd. of Educ., 649 P.2d 1005, 1010-11 (Colo.1982); Horton v. Meskill, 172 Conn. 615, 376 A.2d 359, 361 (1977); McDaniel v. Thomas, 248 Ga. 632, 285 S.E.2d 156, 157 (1981); Thompson v. Engelking, 96 Idaho 793, 537 P.2d 635, 636 (1975); Comm. for Educ. Rights v. Edgar, 174 Ill.2d 1, 220 Ill.Dec. 166, 672 N.E.2d 1178, 1182 (1996); Unified Sch. Dist. No. 229 v. State, 256 Kan. 232, 885 P.2d 1170, 1173 (1994); Rose v. Council for Better Educ., Inc., 790 S.W.2d 186, 190 (Ky.1989); Hombeck v. Somerset Cnty. Bd. of Educ., 295 Md. 597, 458 A.2d 758, 764 (1983); McDuffy, 615 N.E.2d at 522; Helena Elementary Sch. Dist. No. 1 v. State, 236 Mont. 44, 769 P.2d 684, 685 (1989); Campaign for Fiscal Equity, Inc. v. State, 86 N.Y.2d 307, 631 N.Y.S.2d 565, 655 N.E.2d 661, 663 (1995); Leandro v. State, 346 N.C. 336, 488 S.E.2d 249, 252 (1997); City of Pawtucket v. Sundlun, 662 A.2d 40, 42 (R.I.1995); Abbeville Cnty. Sch. Dist. v. State, 335 S.C. 58, 515 S.E.2d 535, 538 (1999); Tenn. Small Sch. Sys. v. McWherter, 851 S.W.2d 139, 140 (Tenn.1993); Edgewood Indep. Sch. Dist. v. Kirby, 777 S.W.2d 391, 392 (Tex.1989); Brigham v. State, 166 Vt. 246, 692 A.2d 384, 385 (1997); Scott v. Commonwealth, 247 Va. 379, 443 S.E.2d 138, 140 (1994); Pauley, 255 S.E.2d at 861; Kukor v. Grover, 148 Wis.2d 469, 436 N.W.2d 568, 570 (1989).

. Ala. Coal. for Equity, Inc. v. Hunt, CV-90-883-R, CV-91-0117, 1993 WL 204083 (Ala.Cir.Ct. April 1, 1993).

. See Bishop, 877 P.2d at 816; DuPree, 651 S.W.2d at 93; Horton, 376 A.2d at 374-75; Rose, 790 S.W.2d at 189; McDuffy, 615 N.E.2d at 555-56; Helena Elementary Sch. Dist. No. 1, 769 P.2d at 685; Claremont Sch. Dist. v. Governor, 138 N.H. 183, 635 A.2d 1375, 1376 (1993); Campaign for Fiscal Equity, Inc., 631 N.Y.S.2d 565, 655 N.E.2d at 663; Leandro, 488 S.E.2d at 255; Abbeville Cnty. Sch. Dist., 515 S.E.2d at 538; Tenn. Small Sch. Sys., 851 S.W.2d at 141; Kirby, 777 S.W.2d at 392; Brigham, 692 A.2d at 385; Seattle Sch. Dist. No. 1 v. State, 90 Wash.2d *74 476, 585 P.2d 71, 92 (1978); Pauley, 255 S.E.2d at 878; Washakie Cnty. Sch. Dist. No. One v. Herschler, 606 P.2d 310, 337 (Wyo.1980).

. See Matanuska-Susitna Borough Sch. Dist. v. State, 931 P.2d 391, 394 (Alaska 1997); Lujan, 649 P.2d at 1010-11; Coal. for Adequacy & Fairness in Sch. Funding, Inc. v. Chiles, 680 So.2d 400, 402 (Fla.1996), superseded by amendment, Florida Const, art. IX, § 1 (1998 amend.), as recognized in Bush v. Holmes, 919 So.2d 392 (Fla.2006); McDaniel, 285 S.E.2d at 168; Comm, for Educ. Rights, 220 Ill.Dec. 166, 672 N.E.2d at 1180-81; Montoy v. State, 278 Kan. 769, 120 P.3d 306, 308 (2005); Sch. Admin. Dist. No. 1 v. Comm'r, 659 A.2d 854, 855 (Me.1995); Hornbeck, 458 A.2d at 790; Skeen v. State, 505 N.W.2d 299, 320 (Minn.1993); Neb. Coal, for Educ. Equity & Adequacy v. Heineman, 273 Neb. 531, 731 N.W.2d 164, 169 (2007); Okla. Educ. Ass’n v. State ex rel. Okla. Legislature, 158 P.3d 1058, 1061 (Okla.2007); Sundlun, 662 A.2d at 42.

. Matanuska-Susitna Borough Sch. Dist., 931 P.2d at 399-401 (holding equal protection claim challenging school finance was subject to sliding scale scrutiny under state equal protection clause, but no evidence presented to show that plaintiffs were disparately affected by finance system); Sch. Admin. Dist. No. 1, 659 A.2d at 857 n. 5 (stating allegations did not claim education fell beneath the basic minimum skills necessary for the enjoyment of rights of speech and full participation in the political process); Skeen, 505 N.W.2d at 302-03 (noting the plaintiffs conceded that they received an adequate education, therefore satisfying the fundamental right to a general and adequate education); Scott, 443 S.E.2d at 142 (holding education is a fundamental right, but finding no violation on the facts); Kukor, 436 N.W.2d at 579 (finding equal opportunity in education is a fundamental right, but no violation on facts).

. See, e.g., Coal, for Adequacy & Fairness, 680 So.2d at 410-11 (Anstead, J., dissenting in part); Montoy, 120 P.3d at 311-18 (Beier, J., concurring); Lujan, 649 P.2d at 1028-32 (Dubofsky, J., dissenting); Lujan, 649 P.2d at 1032-48 (Lohr, J., dissenting); Rose, 790 S.W.2d at 220-29 (Vance, J., dissenting); Hornbeck, 458 A.2d at 791-805 (Cole, J., dissenting); McDuffy, 615 N.E.2d at 556-57 (O'Connor, J., concurring in part & dissenting in part); Kukor, 436 N.W.2d at 587-94 (Bablitch, J., dissenting).

. See, e.g., Lake View Sch. Dist. No. 25 v. Huckabee, 351 Ark. 31, 91 S.W.3d 472, 479 (2002) (noting the trial involved nineteen days, thirty-six witnesses, and 187 exhibits); DuPree, 651 S.W.2d at 95 (noting trial with thirty-nine witnesses, 287 exhibits, and 7400 pages of testimony); Horton, 376 A.2d at 361 (citing "thorough and exhaustive record submitted by the trial court”).

. See, e.g., Ex parte James, 836 So.2d 813, 819 (Ala.2002); Comm, for Educ. Rights, 220 Ill.Dec. 166, 672 N.E.2d at 1193; Neb. Coal, for Educ. Equity & Adequacy, 731 N.W.2d at 183; Okla. Educ. Ass’n, 158 P.3d at 1066; Sundlun, 662 A.2d at 62.

. See Ratner, 63 Tex. L.Rev. at 814-16 (placing Iowa’s constitutional provisions in a third category containing "a stronger and more specific education mandate” than in the first two groups, but less strong than a fourth group).

.See Op. of the Justices, 624 So.2d at 110-11 ("liberal”); Lake View, 91 S.W.3d at 495 *76 ("general, suitable, and efficient”); Bishop, 877 P.2d at 808 ("general and uniform”); Rose, 790 S.W.2d at 212-13 ("efficient”); Hombeck, 458 A.2d at 780 ("thorough and efficient”); Campaign for Fiscal Equity, 631 N.Y.S.2d 565, 655 N.E.2d at 665 (“a system of free. common schools”); DeRolph, 728 N.E.2d at 1001 ("thorough and efficient"); Tenn. Small Sch. Sys., 851 S.W.2d at 150-51 ("a system of free common schools”).

.See Serrano I, 96 Cal.Rptr. 601, 487 P.2d at 1248-49.

. See Lujan, 649 P.2d at 1010-11.

. See Coal. for Adequacy & Fairness, 680 So.2d at 406.

. See McDaniel, 285 S.E.2d at 165.

. See Evans, 850 P.2d at 734.

. See Bonner ex rel. Bonner v. Daniels, 907 N.E.2d 516, 520 (Ind.2009).

. See Serrano II, 135 CahRptr. 345, 557 P.2d at 951; Robinson v. Cahill, 69 NJ. 133, 351 A.2d 713, 720(1975).

. See Thompson, 537 P.2d at 644-45; Comm. for Educ. Rights, 220 Ill.Dec. 166, 672 N.E.2d at 1194-95.

. See, e.g., Lujan, 649 P.2d at 1022-23. It should be noted, however, that in Lujan the plaintiffs failed to plead or prove a denial of educational opportunity. This amounts to the failure to plead and prove an adequacy claim. Id. at 1018; see also McDaniel, 285 S.E.2d at 156.

. See, e.g., DuPree, 651 S.W.2d at 93; Tenn. Small Sch. Sys., 851 S.W.2d at 154.

. See, e.g., William E. Thro, Judicial Paradigms of Educational Equality, 174 Educ. Law Rep. 1, 7 (2003).

. William E. Thro, Note, To Render Them Safe: The Analysis of State Constitutional Provisions in Public School Finance Reform Litigation, 75 Va. L.Rev. 1639, 1666 & n. 118 (1989) (characterizing Iowa’s education provisions as a Category III provision that provides a "stronger and more specific” mandate than Categories I and II, but less specific than Category IV). On the other hand, another commentator has noted that other states, such as Virginia, Montana, Louisiana, and Washington, have education clauses that seem to demand a higher quality of education than the Iowa provisions and suggests that the Iowa provision is among state constitutional provisions ”[s]etting [l]ower [standards.” See Molly Mcllsic, The Use of Education Clauses in School Finance Reform Litigation, 28 Harv. J. on Legis. 307, 334-37 (1991).

. As noted above, the Universal Declaration of Human Rights, article 26, describes the right to a public education as a human right. The Universal Declaration has been ratified by the United States. The case of The Paquete Habana, 175 U.S. 677, 20 S.Ct. 290, 44 L.Ed. 320 (1900), stands for the proposition that international treaty obligations are binding upon United States courts. The West Virginia Supreme Court relied on the Universal Declaration in declaring that education is a fundamental right under its state constitution. Pauley, 255 S.E.2d at 863 n. 5, 878.

. See, e.g., DuPree, 651 S.W.2d at 93; Serrano II, 135 Cal.Rptr. 345, 557 P.2d at 952; Horton, 376 A.2d at 373; Rose, 790 S.W.2d at 206; Skeen, 505 N.W.2d at 313-14; Robinson, 351 A.2d at 720; Tenn. Small Sch. Sys., 851 S.W.2d at 154-56; Scott, 443 S.E.2d at 142; Seattle Sch. Dist. No. 1, 585 P.2d at 92; Pauley, 255 S.E.2d at 878; Kukor, 436 N.W.2d at 579.

. There is a suggestion that to find any meaningful judicial role in the field of education under a state constitution would set a "dangerous” precedent. Such an extreme characterization is belied by court decisions in rulings in many states, including Texas, New York, California, South Carolina, New Jersey, Arkansas, West Virginia, Kentucky, and Washington. The suggestion of dangerousness would likely be surprising to the four sober dissenting Justices of the United States Supreme Court in San Antonio. While the decisions of the various state supreme courts and the opinions of the four dissenting Justices in San Antonio are not, of course, "dangerous,”. they may be controversial. Of course, judicial decisions are driven by applicable legal principles and underlying facts, not by public approval or disapproval.

. See, e.g., Robert C. Farrell, Successful Rational Basis Claims in the Supreme Court from the 1971 Term Through Romer v. Evans, 32 Ind. L.Rev. 357, 382 (1999) (noting different rational basis tests); Jennifer L. Greenblatt, Putting the Government to the (Heightened, Intermediate, or Strict) Scrutiny Test: Disparate Application Shows Not All Rights and Powers Are Created Equal, 10 Fla. Coastal L.Rev. 421, 477 (2009) (United States Supreme Court has plainly strayed from three-tiered approach); Gunther, 86 Harv. L.Rev. at 17-24 (noting dissatisfaction with tiers and tendency to intervene without strict scrutiny); R. Randall Kelso, Standards of Review Under the Equal Protection Clause and Related Constitutional Doctrines Protecting Individual Rights: The “Base Plus Six” Model and Modem Supreme Court Practice, 4 U. Pa. J. Const. L. 225, 230-33 (2002) (identifying three dif *85 ferent types of rational basis review in United States Supreme Court cases); Raffi S. Bar-outjian, Note, The Advent of the Multifactor, Sliding-Scale Standard of Equal Protection Review: Out with the Traditional Three-Tier Method of Analysis, in with Romer v. Evans, 30 Loy. L.A. L.Rev. 1277, 1301-05 (1997) (citing Romer v. Evans, 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996), as example of stricter rational basis review under Federal Equal Protection Clause); Peter S. Smith, Note, The Demise of Three-Tier Review: Has the United States Supreme Court Adopted A “Sliding Scale” Approach Toward Equal Protection Jurisprudence?, 23 J. Contemp. L. 475, 480-88 (1997) (citing Justice Marshall dissents advocating sliding scale approach); Neelum J. Wadhwani, Note, Rational Reviews, Irrational Results, 84 Tex. L.Rev. 801, 803 (2006) (noting waffling between rational basis test — where any conceivable government interests is sufficient — and more stringent test, which includes inquiry regarding whether the actual government action taken is justifiable).

. For a rich description of state constitutional provisions related to equal treatment under the law and the power of state courts to interpret them independently of federal law, see 1 Jennifer Friesen, State Constitutional Law: Litigating Individual Rights, Claims, and Defenses § 3:01, at 3-2 through 3-15 (4th ed.2006). See also Schuman, 13 Vt. L.Rev. at 221-22; Shaman, 34 Rutgers L.J. at 1029-56.

. The claim that this court should not function as an elected school board creates a *88 straw person. No one advocated interference with the daily administration of school boards in this case or in the dozens of other state court cases that have found a fundamental right to a basic education. While we must maintain a healthy respect for the other branches of government, we must fearlessly perform our role as judges to ensure that the other branches of government perform their duties in a manner consistent with the Iowa Constitution. Indeed, the very purpose of the privileges and immunities clause in the Iowa Constitution is to restrain elected officials from treating citizens differently in ways that do not make sense. Bromides about elections and ballot boxes do not assist the court in its performance of the difficult but essential role of judicial review established by Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60, 73 (1803). To suggest that elected bodies always have the last word in educational matters is, of course, the argument raised in opposition to Brown.

. The term "Our Localism” was coined by Richard Briffault in two important scholarly articles, Richard Briffault, Our Localism: Part I — The Structure of Local Government Law, 90 Colum. L.Rev. 1 (1990), and Richard Brif-fault, Our Localism: Part II — Localism and Legal Theory, 90 Colum. L.Rev. 346 (1990).